In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2091

John Whitehead,

Petitioner-Appellant,

v.

Roger D. Cowan, Warden,
Menard Correctional Center,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 5013--Ann Claire Williams, Judge.

Argued June 19, 2001--Decided August 29, 2001


   Before Bauer, Manion, and Kanne, Circuit
Judges.

   Manion, Circuit Judge.  Petitioner John
Whitehead was convicted by a jury in
Illinois state court of murder and
aggravated kidnaping. Whitehead was then
sentenced to death by the trial judge.
The Illinois Supreme Court affirmed his
conviction on direct appeal, and the
United States Supreme Court denied a
petition for writ of certiorari.
Whitehead then filed several petitions
for post-conviction relief in state
court. The trial court denied these peti
tions, and the Illinois Supreme Court
affirmed. Again the United States Supreme
Court denied a petition for writ of
certiorari. Whitehead then filed a
petition seeking a writ of habeas corpus
under 28 U.S.C. sec. 2254 alleging eleven
constitutional errors during his state
court trial and appeal. The district
court denied the petition, and Whitehead
appeals. We affirm.

I.

   The first Illinois Supreme Court opinion
provides a thorough summary of the facts
in this case, which we excerpt below:

Vickie Wrobel, a five-year-old girl who
lived with her parents in Joliet, was
missing from the family residence during

the evening of August 9, 1982. While searching for her, Vickie Wrobel's mother asked the Wrobels'tenant, Esther Harmon, whether she had seen Vickie. Esther Harmon, her daughter, LeAllen Starbuck, and LeAllen's husband, William Starbuck, lived with the defendant in a house adjacent to the Wrobels' tavern and home. On speaking with Vickie Wrobel's mother, Esther Harmon discovered that both the defendant and the Harmon car, which the defendant sometimes used with her permission, were also missing. Local police agencies were notified that the defendant was suspected of stealing Esther Harmon's car and that he might have taken Vickie Wrobel.

Sometime after midnight the following morning, the defendant telephoned the Wrobels' tavern and spoke with LeAllen Starbuck. He told LeAllen that he was calling from Samuel and Jeanine Starbuck's in Godley; Jeanine is the defendant's sister and is married to William Starbuck's brother. LeAllen advised the defendant to stay at his sister's home, and she then told the police where the defendant was located.

Shortly after LeAllen's call, area police arrived at the Starbuck residence in Godley. The officers saw Esther Harmon's automobile parked in front of the residence, and from outside the car officers observed clothing on the front seat of the car that matched the description of clothing worn by Vickie Wrobel when she disappeared the previous evening. Samuel Starbuck let the officers into his living room, where the defendant was seated. The defendant admitted to being in possession of Esther Harmon's car, and he was arrested for auto theft.

The defendant was questioned by two detectives of the Joliet police department from about 4 a.m. until 6:30 a.m. that day. He was generally responsive, but when questioned concerning the whereabouts or condition of Vickie Wrobel, the defendant made no statements other than "I can't" or "I can't tell you." The interrogation ended when the defendant indicated a desire to consult with an attorney.

An hour or so later, at approximately 7:30 a.m. on August 10, 1982, railroad workers discovered a naked body, later

identified as the body of Vickie Wrobel, floating in the Mazon River. An autopsy revealed that the victim had been sexually molested and had been killed by strangulation and drowning. Physical evidence recovered alongside the river included articles of the victim's clothing and a shirt later identified as the shirt worn by the defendant on the evening of August 9. In the shirt pocket there was a lottery ticket with writing that a handwriting analyst identified as the defendant's.

Additional physical evidence implicating the defendant was found in Esther Harmon's automobile. Some of the victim's clothing was on the front seat. Also found was a plastic drinking cup similar to that given Vickie Wrobel by the Wrobels' bartender shortly before the girl disappeared. The armrest and passenger door panel were stained with a fluid that was determined to have a chemical composition consistent with the nonalcoholic "cocktail" served to Vickie Wrobel in the plastic cup. The floormats in Esther Harmon's car were damp, and vegetation like that growing along the Mazon River was also found on the floor area in front of thedriver's seat. Other evidence produced at trial placed the defendant in the general vicinity where Vickie Wrobel was playing immediately prior to her apparent kidnaping.

While in the custody of the Joliet police department on the 10th and 11th of August, the defendant made eight statements to investigating officers in which he admitted kidnaping, sexually assaulting, and killing Vickie Wrobel. His description of how he sexually abused the victim was consistent with the autopsy report, and the defendant's claim of having forced Vickie Wrobel to drink beer was also substantiated by the post-mortem examination.

People v. Whitehead, 508 N.E.2d 687, 689-90 (Ill. 1987) ("Whitehead I").

   In July 1983, Whitehead was convicted in the Circuit Court of Grundy County of murder and aggravated kidnaping. Whitehead waived his right to have a jury determine his sentence, and the trial judge sentenced Whitehead to death. On February 20, 1987, the Illinois Supreme Court affirmed on direct appeal. The

United States Supreme Court denied a petition for writ of certiorari. Whitehead's subsequent petitions for state post-conviction relief were also denied, and on February 15, 1996, the Illinois Supreme Court again affirmed. Once again, the United States Supreme Court denied a petition for writ of certiorari.

On May 20, 1997, Whitehead filed a petition for writ of habeas corpus in federal district court. This petition was amended on August 10, 1998, and alleged eleven grounds for relief. On March 30, 2000, the district court denied habeas relief, and on April 13, 2000, Whitehead filed a motion for certificate of appealability. The district court denied the motion. On April 26, 2000, Whitehead appealed the denial of habeas relief, and this case was docketed. On May 15, 2000, Whitehead sought a certificate of appealability from this court, which was granted on five issues. Whitehead claimed his inculpatory statements were admitted in violation of the Fifth and Fourteenth Amendments; that he was not tried before a fair and impartial jury in violation of the Fifth and Fourteenth Amendments; that there was prosecutorial misconduct in violation of the Fifth and Fourteenth Amendments; that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments; and that there was an invalid waiver of a sentencing jury in a capital case, in violation of the Fourteenth Amendment.

II.

As the habeas petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. sec. 2254, the standard of review contained therein governs Whitehead's claims. See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). The relevant portion of the AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-- . . . resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established
Federal law, as determined by the Supreme
Court of the United States; . . . .

28 U.S.C. sec. 2254(d)(1).

As the Supreme Court has explained, a
state court decision is "contrary to"
clearly established Supreme Court
precedent "if the state court applies a
rule that contradicts the governing law
set forth in [Supreme Court] cases," or
"if the state court confronts a set of
facts that are materially
indistinguishable from a decision of [the
Supreme] Court and nevertheless arrives
at a result different from [Supreme
Court] precedent." Williams v. Taylor,
529 U.S. 362, 405 (2000). A state court
decision is an "unreasonable application"
of clearly established Supreme Court
precedent when "the state court
identifies the correct governing legal
rule from [the Supreme Court's] cases but
unreasonably applies it to the facts of
the particular state prisoner's case," or
"the state court either unreasonably
extends a legal principle from [Supreme
Court] precedent to a new context where
it should not apply or unreasonably
refuses to extend that principle to a new
context where it should apply." Id. at
407.

On appeal from a ruling on a petition
for habeas relief, we review the district
court's findings of fact for clear error
and its rulings on issues of law de novo.
See Denny v. Gudmanson, 252 F.3d 896, 900
(7th Cir. 2001). If the case falls under
the "contrary to" clause of sec.
2254(d)(1), then we review the state
court decision de novo to decide what is
clearly established law as determined by
the Supreme Court and whether the state
court decision was "contrary to" that
Supreme Court precedent. See id. If, on
the other hand, the case falls under the
"unreasonable application" clause, then
we defer to a reasonable state court
decision. See id. Moreover, state court
factual findings that are reasonably
based on the record are presumed correct.
See 28 U.S.C. sec. 2254(e)(1); Gudmanson,
252 F.3d at 900.

A.  Whitehead's Inculpatory Statements

Whitehead challenges the admission at
trial of his inculpatory statements,

claiming they were the product of a police interrogation in violation of the Fifth and Fourteenth Amendments to the Constitution. The district court succinctly set forth the background for this claim, as follows:

After taking Whitehead into police custody, the Joliet police began interrogating him about the disappearance of Vickie Wrobel. Whenever the police asked Whitehead about Vickie, he simply responded, "I can't" or "I can't tell you." Eventually, Whitehead told the police that he wanted an attorney and the interrogation ended.

Prior to Whitehead's interrogation, both LeAllen Starbuck and Jeanine Starbuck indicated to police that if Whitehead knew anything about Vickie's disappearance, they were the only two people in whom he would confide that information. Nevertheless, police refused to let either LeAllen Starbuck or Jeanine Starbuck speak to Whitehead and unsuccessfully tried to get Whitehead to confess that he knew something about Vickie's whereabouts. After two and a half hours of trying, and after Whitehead had invoked his right to have an attorney with him during any further questioning, the police ended their interrogation.

Before and after the interrogation LeAllen Starbuck requested to speak with Whitehead, but the police initially refused to let her see him. Eventually, the police allowed LeAllen to meet with Whitehead and during their meeting, LeAllen persuaded Whitehead to tell her everything he knew about Vickie's disappearance. Whitehead then admitted to LeAllen that he had killed Vickie. LeAllen convinced Whitehead that he should confess to the police because he was mentally ill, needed treatment, and that the only way he could get help was to confess his crime to the police. Whitehead agreed to confess and sent LeAllen out of the room to notify the police that he would talk to them. When police returned to the room, Whitehead made eight statements in which he admitted to killing and raping Vickie.

United States v. Page, 2000 WL 343209, *4 (N.D.Ill. 2000).

  Under Miranda v. Arizona, 384 U.S. 436,

474 (1966), once a suspect requests an attorney, a police interrogation must cease until an attorney is present, unless the conversation is reinitiated by the suspect. Whitehead claims his right against self-incrimination under the Fifth and Fourteenth Amendments was violated because interrogation proceeded after he had requested an attorney. Whitehead also claims that the prosecution bears a heavy burden to prove that a defendant initiated further communication with the police if the interrogation continued after an attorney was requested, citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), and claims that the prosecution never met this alleged burden.

As is evident from the undisputed facts of this case, however, the police themselves did not interrogate Whitehead after he requested an attorney. Indeed, Whitehead does not claim that he did not reinitiate the interrogation after speaking with LeAllen Starbuck. Instead, Whitehead theorizes that the conversation he had with LeAllen Starbuck was itself the "functional equivalent" of a police interrogation, citing Rhode Island v. Innis, 446 U.S. 291 (1980). In Innis, the Supreme Court explained that the Miranda protections extend to the functional equivalent of express questioning, defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." See id. at 301. And, in inquiring whether police actions are the functional equivalent of express questioning, the Court explained that the proper focus is "primarily upon the perceptions of the suspect, rather than the intent of the police." Id.

But Innis, and by extension Miranda, provide no relief for Whitehead. The Supreme Court has already addressed a situation akin to Whitehead's in Arizona v. Mauro, 481 U.S. 520 (1987), and concluded that no interrogation occurred. In that case, Mauro had confessed to killing his son. After his arrest, he requested an attorney and all questioning of Mauro ceased. A police officer was questioning the suspect's wife, Mrs. Mauro, in another room. She asked to speak with her husband, and although the

police were reluctant, they allowed her to see him in the presence of the police, who placed a tape recorder in plain view. Mauro instructed his wife not to answer any police questions until an attorney was present, and stated, "Don't answer any questions until you get rights of attorney before you find out whats [sic] going on. You tried to stop me as best you can. What are you going to do, kill me? You tried the best you can to stop me." The tape of this conversation was used in the rebuttal to Mauro's insanity defense at trial. Using the "functional equivalent" theory Whitehead now raises, Mauro sought to suppress the evidence on the theory that it was the product of police interrogation in violation of his Miranda rights. The Supreme Court nevertheless determined that Mauro's right against self-incrimination was not violated.

There is no relevant difference between the Mauro case and the present one. As the Mauro Court emphasized, "The tape recording of the conversation between Mauro and his wife shows that Detective Manson asked Mauro no questions about the crime or his conduct. Nor is it suggested--or supported by any evidence-- that Sergeant Allen's decision to allow Mauro's wife to see him was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." Id. at 527. Likewise, in the present case, the police asked no questions of Whitehead--in fact unlike Mauro they were not even in the room when LeAllen Starbuck spoke with Whitehead. There is no evidence to support a claim that the police engaged in a psychological ploy designed to elicit a confession. Indeed, there is no evidence presented that the police gave LeAllen Starbuck any instructions to say certain things to Whitehead.

Whitehead points to evidence the police expected that if his sister, Jeanine Starbuck, spoke to Whitehead she would relay any information to them, and points to evidence that the police did not expect their own questioning of Whitehead to be successful. According to Whitehead, the "inescapable common sense and reasonable conclusion" is that the police had "more than just a hope" that LeAllen Starbuck would procure incriminating evidence against Whitehead. This is not

an inescapable conclusion, however--it is speculation. In Mauro, "both detectives had acknowledged in pretrial hearings that they knew it was 'possible' that Mauro might make incriminating statements if he saw his wife." See id. at 524. It is beyond imagining that the police in Mauro did not hope this possibility would come to fruition, but that does not mean that a ploy existed: "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." Id. at 529. A police awareness that suspects sometimes confess after they speak with close friends or family does not mean this court should adopt a rule that encourages police to bar friends or family members from seeing a suspect. Cf. id. at 530 ("Police departments need not adopt inflexible rules barring suspects from speaking with their spouses . . . .").

Whatever hopes the police may have had in this case, it is clear from the record that they had no plan to have LeAllen Starbuck speak with Whitehead as their agent. To the contrary, they initially refused her request. LeAllen Starbuck was not instructed by the police to ask certain questions or achieve a certain result. Most importantly, there was nothing about her presence which would make Whitehead feel that he had to confess to her, and it is the suspect's perspective which matters. See Innis, 446 U.S. at 301. As the Supreme Court summed up its decision in Mauro, the petitioner "was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation." See Mauro, 481 U.S. at 529. The same reasoning applies here. See also United States v. Gaddy, 894 F.2d 1307, 1311 (11th Cir. 1990) (suspect in custody was not interrogated when aunt, who was employed by the police department, urged him to tell police what he knew about a crime); Snethen v. Nix, 885 F.2d 456, 457 (8th Cir. 1989) (suspect in custody was not interrogated when he confessed after a conversation with his mother, who had told police before the conversation that "if [my son] did this, he will tell me.").

B.  Fair and Impartial Jury

Whitehead raises several arguments that he was deprived of a fair trial before an impartial jury in violation of the Fifth and Fourteenth Amendments. Each of these arguments was considered, and rejected, by the Illinois Supreme Court. Whitehead's first claim is that the state trial court should have granted his motion to have his case transferred to another venue because of pretrial publicity and local animosity. Whitehead argues that he was deprived of a fair trial before an impartial jury because of the effects of this publicity and animosity on his trial.

1.  Newspaper publicity.

In support, Whitehead states that the local newspaper, the Morris Daily Herald, published articles containing information not admitted at trial, including Whitehead's alleged request for the death penalty, his prior criminal record, and his suspected involvement in an unrelated child abduction case. He further notes that trial counsel "was told by everyone he spoke with in the community that they felt the Petitioner should be killed." Whitehead also points to the voir dire testimony of five individuals who ultimately sat on the jury./1 One juror stated that she regularly read the Morris Daily Herald and had read articles about the case that "had something to do with how many jurors they were going to choose" and described "going through a lot of motions in court about it, some different legalities; I don't even remember what they were." Another juror who read the Morris Daily Herald remembered reading articles about "appeals and motions" and "that the man had been charged and that there had been a motion for moving the trial and other things that was [sic] in there." An additional juror recalled reading that "one police officer erased a tape. I do remember that. What the tape was, I couldn't tell you. I don't recall what the tape was except through some error, he erased the tape. That's all I remember about it at this time, yes." Yet another juror remembered reading "something in the paper saying that this trial was coming up." Finally, a juror testified that he had not read "a great deal about the case and did not recall reading any statements about [Whitehead] or police

officers." This juror did admit, however, that "all I know is what I have read in the paper, which I assume they know what they are talking about more or less, and that's all, what's been said in the paper." Upon questioning from the trial judge, however, each of these jurors testified during voir dire that they could approach the case with an open mind, despite the articles they had read. See Whitehead I, 508 N.E.2d at 692.

"The constitutional standard of fairness requires that a defendant have a panel of impartial, 'indifferent jurors.'" Murphy v. Florida, 421 U.S. 794, 799 (1975) (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin, 366 U.S. at 723. "At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will demonstrate the presumption of partiality.'" Murphy, 421 U.S. at 800 (quoting Irvin, 366 U.S. at 723).

Whitehead relies heavily on the extreme cases where an intrusive media presence has utterly corrupted the proceedings. See, e.g., Estes v. Texas, 381 U.S. 532 (1965), Rideau v. Louisiana, 373 U.S. 723 (1963). In Estes and Rideau, prejudice was presumed and a new trial was mandated. But Whitehead has not presented evidence sufficient to create the presumption of prejudice that is required by such cases. In Estes, the trial was conducted in a circus atmosphere, with the press sitting within the bar of the court. In Rideau, a twenty-minute confession by the defendant was broadcast three times by a local television station. As the Supreme Court noted in Murphy, the proceedings in those cases "were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to the notion of fairness and rejects the

verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." 421 U.S. at 799.

This case resembles the situations in Murphy and Patton v. Yount, 467 U.S. 1025 (1984), in which the Supreme Court held that the right to an impartial jury was not denied. In Murphy, there was no circus-like atmosphere to the trial; the court held that the media presence was insufficient to create a presumption of prejudice, and that the voir dire "indicate[d] no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." Murphy, 421 U.S. at 800. And in Yount, publicity had revealed the petitioner's prior conviction for murder, his confession, and his prior plea of temporary insanity, none of which were admitted as evidence at trial. In that case, the defendant was tried twice. There was evidence that the jurors had formed an opinion of guilt years before the second trial, but that they did not hold a fixed opinion when they were seated as jurors for that trial. In addition, some jurors provided testimony regarding their opinion of the case that was ambiguous or contradictory. The Court nevertheless deferred to the trial court's holding that the jurors were impartial. See Yount, 467 U.S. at 1040. Similarly, the voir dire testimony in this case indicates that the jurors had no fixed opinions about the guilt or innocence of Whitehead. If anything, the evidence in the present case is much milder than the evidence in Yount. In light of the Supreme Court's decisions in Murphy and Yount, we conclude that the Illinois Supreme Court's ruling on this issue was not contrary to or an unreasonable application of established Supreme Court precedent.

2. Publication of juror names and addresses.

Next, Whitehead argues that his right to a fair and impartial jury was violated because a local newspaper published the names and addresses of the jurors.

Indeed, the Supreme Court has found that publication of juror names and addresses can contribute to the deprivation of a fair trial. See Sheppard v. Maxwell, 384 U.S. 333 (1966). Sheppard, like Estes and Rideau, was a case of presumed prejudice, however. The result in that case "arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival." Murphy, 421 U.S. at 799. Moreover, in Sheppard the publication of juror names and addresses meant that "the jurors were thrust into the role of celebrities." The publication of their names and addresses resulted in "expressions of opinion from both cranks and friends," including anonymous letters. See Sheppard, 384 U.S. at 353. There is no evidence of similar juror contacts in this case, and the Sheppard Court based its decision on the totality of the circumstances. We conclude that Sheppard does not require a finding of presumed prejudice based on the publication of juror names and addresses in the circumstances of this case.

In addition, the mere fact that the jury was exposed to something which could theoretically affect its vote is not sufficient to require a new trial. As the Supreme Court has noted:

[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Smith v. Phillips, 455 U.S. 209, 217 (1982).

Here, Whitehead simply presents speculation that the jury was not impartial because jurors complained about the publication of their names and

addresses. Evidence that the jury was displeased that their anonymity was lost in a murder trial, however, is a long way from evidence that jurors were less than impartial. We agree with the Illinois Supreme Court that "[w]e cannot infer . . . on this basis that an honest juror would therefore give sway to his emotions and disregard the fundamental requirement of a fair trial and decide to convict a person in order to be absolutely secure." People v. Whitehead, 662 N.E.2d 1304, 1326 (Ill. 1996) ("Whitehead II"). Cf. Kinnamon v. Scott, 40 F.3d 731, 733 (5th Cir. 1994) ("That members of a jury in a capital murder case do not want the defendant examining information concerning their home addresses, phone numbers, etc. raises no concern of constitutional magnitude."). There is no reasonable possibility that the publication of names and addresses affected the jury's verdict, and this is fatal to Whitehead's claim. See United States v. Davis, 15 F.3d 1393, 1412 (7th Cir. 1994). In sum, the Illinois Supreme Court's ruling on this issue was not contrary to, or an unreasonable application of, clearly established federal law.

In this case, it would be sheer speculation to suggest the publication of addresses would prejudice the jury, and accordingly we do not think a hearing was necessary on these facts. "'[T]he duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality. In other words, there must be something more than mere speculation.'" Id. (quoting United States v. Barshov, 733 F.2d 842, 851 (11th Cir. 1984)).

Whitehead nevertheless claims that the publication of jurors' names and addresses requires a hearing to determine its effect under Remmer v. United States, 347 U.S. 227, 229 (1954). In Remmer, a third party contacted a juror and suggested that "he could profit by bringing in a verdict favorable to the petitioner." Id. at 228. The defendant moved for a new trial and sought a hearing on the issue, which was denied by the trial court. The Supreme Court, however, ruled that a hearing was necessary in these circumstances. As the Remmer Court explained:

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instruction and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and a hearing of the defendant, that such contact with the juror was harmless to the defendant.

Id. at 229.

Although it is true that Remmer calls for a hearing in many cases where there is a communication with a juror during a trial, we do not agree that Remmer applies to the publication of juror addresses. See United States v.-Williams-Davis, 90 F.3d 490, 501 (D.C. Cir. 1996) ("In affirming the trial court, we endorse its view that defendants bringing post-trial claims of mid-trial media exposure must make a threshold showing of a likelihood of prejudice. . . . [W]e think Remmer never applied at all outside the area of private contacts with jurors."). See also United States v. Boylan, 898 F.2d 230, 258-60 (1st Cir. 1990). The media publication of the jurors' names and addresses does not address a matter at issue in the trial or provide any new information about the case to the jurors, nor did the context of the publication, as in Sheppard, demonstrate a likelihood that it would affect the jury's deliberations. This is not a third-party contact of the sort described in Remmer. We conclude that the Illinois Supreme Court's determination that a hearing was unnecessary was appropriate on these facts./2


3. Emotional outburst in jury's presence and judge's absence.

Finally, Whitehead claims that the jury was prejudiced because at one point in the trial, the judge, counsel, and court reporter retired to chambers while the jury, Whitehead, and the victim's mother, who was on the witness stand, remained in court. Whitehead presents affidavits from

a juror and the court clerk, stating that during the judge's absence the victim's mother rose and began shouting at the defendant and crying. Allegedly, she then asked the petitioner why he had killed her daughter. Once back on the bench, the trial judge admonished the jury to disregard any comments which might have been made by the witness.

Obviously, the trial judge should never have permitted this circumstance to arise by leaving the courtroom with jurors in the jury box, the victim's mother on the witness stand, and the petitioner seated at his table. It is not surprising that a mother would have this reaction in the presence of the suspected murderer of her child, and had the judge been there he could have prevented or at least controlled the situation. The question is what effect this error would have on the jury. Any jury would expect that a close relative of the victim would have strong emotions towards the suspected killer. The outburst directed at the accused in the presence of the jury did not provide any information not admitted at trial that could indicate guilt or innocence. Unfortunate as the event was, it was not an error that automatically requires a new trial.

In a similar capital case, Kinnamon, the Fifth Circuit addressed a situation where the jury, the prosecutor, the petitioner, and the victim's daughter were left alone in a room together. According to a juror affidavit, the victim's daughter was crying loudly in front of the jury, although the juror could not remember what the daughter was saying. The petitioner's sister provided an affidavit that the daughter began screaming that the petitioner had killed her father. The state judge presiding over a habeas challenge was unpersuaded that this outburst had occurred. The Kinnamon court concluded, "we are unpersuaded that there was any prejudicial error of constitutional magnitude. That the young girl was upset and angry at the person accused by the state as the murderer of her father communicated nothing new to the jury, even if the incident occurred." 40 F.3d at 734. We agree with this analysis. Moreover, the trial court here specifically instructed the jurors to ignore any comments they might have heard. This further suggests that the

comments would not have had any impact on the jury. See Messer v. Kemp, 760 F.2d 1080 (11th Cir. 1985) (noting import of trial court's curative instruction in case of emotional outburst before jury). Finally, the evidence of defendant's guilt was overwhelming, and this "militates against a finding that the introduction of the disputed [material] effected the jury's verdict." United States v. Paneras, 222 F.3d 406, 411 (7th Cir. 2000).

Whitehead nevertheless claims a hearing was necessary to determine whether or not the mother's outburst had any impact on the jury's impartiality. Again, Whitehead cites Remmer for this proposition. As noted, in Remmer a juror was anonymously contacted and told he could profit if he found for the defendant. Although the juror told the judge (who then had the FBI investigate), the defendant did not find out about the contact until after the jury found him guilty. The government responds that Remmer does not apply to these facts because they do not involve jury tampering. True, Remmer involved a private contact that appeared to be jury tampering, something the court labeled "presumptively prejudicial," requiring a hearing to determine whether the contact was harmless. Whether the absence of jury tampering would foreclose the applicability of the Remmer presumption is open to debate. Cf. United States v. Dutkel, 192 F.3d 893, 895 (9th Cir. 1999) (limiting Remmer's presumption of prejudice to cases where jury tampering established). Even if the Remmer presumption applies to jury contacts which do not involve jury tampering, how ever, we nevertheless conclude that the Remmer presumption does not apply on these facts.

The mother's outburst was directed at Whitehead, not the jury. Although the judge was inexplicably absent, the jury heard the outburst collectively and was then admonished immediately when the judge returned "to disregard any comments that may have been made by the witness when the attorneys were absent and when the Court was absent." No one present, including Whitehead, claims the mother said anything to the jury, and her recorded testimony after the outburst reiterated her grief of losing her daughter. The mother did not attempt to persuade the jury, nor did she provide

them with any extraneous information about the facts of the case. This is a situation quite unlike the private communication with the jury encountered in Remmer. The mother's outburst was not "a purposeful intrusion into the sanctity of the juror's domain." See Schaff v. Snyder, 190 F.3d 513, 534 (distinguishing a child's whisper to its parent that was overheard by a juror from a purposeful intrusion). While understandably emotional, the statement was not prejudicial.

This case involves an innocuous comment, and as we have held previously, no Remmer hearing is necessary in these circumstances. See United States v. Thibodeaux, 758 F.2d 199, 202-03 (7th Cir. 1985) (district court did not err where no inquiry was made into juror reaction to a communication because, unlike Remmer, the comment heard by a juror was ambiguous and innocuous). Furthermore, a number of cases from other circuits confine Remmer to private contacts with jurors that actually pose a danger of prejudicing the jury. See, e.g., White v. Smith, 984 F.2d 163 (6th Cir. 1993) (not applying Remmer where victim's mother, a spectator, told jury "I will pray for you" before jury retired to deliberate); Wright v. Angelone, 151 F.3d 151, 160 n.6 (4th Cir. 1998) (limiting Remmer to cases where petitioner "introduce[d] competent evidence that there was an extrajudicial communication or contact, and that it was more than innocuous interventions.") (internal quotations and citations omitted); Boylan, 898 F.2d at 261 (limiting Remmer presumption of prejudice to cases where "there is an egregious tampering or third party communication which directly injects itself into the jury process."). See also United States v. Brooks, 161 F.3d 1240, 1247 (10th Cir. 1998) (a juror was witnessed smoking a cigarette outside during a lunch break and talking to two security officers for at least ten minutes; the court concluded that Remmer did not apply because there was no evidence in the record that the discussion with the security officers was "about the matter pending before the jury."). These decisions recognize that not all juror contacts present Remmer situations, and are in accord with subsequent Supreme Court holdings respecting juror contacts. See, e.g.,

Phillips, 455 U.S. 209 (not applying Remmer presumption where juror applied for job in the district attorney's office); Rushen v. Spain, 464 U.S. 114 (1983) (not applying Remmer presumption in case of ex parte juror contact with judge). This case, like the abovementioned circuit decisions, simply does not implicate the Remmer presumption. The emotional comment, directed at the accused in front of the entire jury, would not affect a reasonable juror's deliberation as to whether or not Whitehead committed the crime.

Whitehead emphasizes, however, that the mother's outburst occurred off the record. While this is indeed cause for concern, cf. Degrave v. United States, 820 F.2d 870, 872 (7th Cir. 1987), it is not necessarily a decisive error. The significance of an off-the-record contact or communication with one or more jurors will vary with the circumstances of each case. Cf. Paneras, 222 F.3d at 411 ("Each case turns on its own facts, and on 'the degree and pervasiveness of the prejudicial influence possibly resulting.'") (quoting United States v. Solomon, 422 F.2d 1110, 1118 (7th Cir. 1970)). In this case, there is no mystery about the relevant facts of the mother's outburst; Whitehead, who was himself a witness to the mother's outburst, does not allege that anything other than the abovementioned comments were made. Moreover, the Illinois Supreme Court assumed that the outburst occurred as alleged by Whitehead. We will not speculate in these circumstances that more might have been said or done. Cf. Davis, 15 F.3d at 1412-13. See also Brooks, 161 F.3d 1240.

The fact that the outburst was off the record bears consideration, however, in terms of the jury's mental state. The question raised here is not what was said, but rather how the jury reacted to this event. The fact that the outburst was off the record, in the absence of the state trial judge, means that the trial judge would not be in a position to ascertain the effect of the mother's outburst as it was occurring. The content and duration of the outburst, however, is such that it is not reasonable to imagine it would affect the jury's deliberations. And, despite the off-the-record nature of the outburst, it is also very significant

that the jury was instructed to ignore any comments made during the judge's absence. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) (crucial assumption of our constitutional system is that jurors carefully follow the trial court's instructions).

In this case, the Illinois Supreme Court gave careful thought to Whitehead's arguments and treated his allegation of the mother's outburst as true. The court concluded: "[t]he incident was apparently brief, it was isolated, there was no attempt to obtain the jury's sympathy as a result of it, the court admonished the jury, and there was no indication in the record that it would have been unable to heed the admonition and disregard the incident during its deliberations. Simply put, mere speculation concerning prejudice to the defendant is not sufficient to warrant reversal." Whitehead II, 662 N.E.2d at 1326. We agree.

The trial court's error, which led to the mother's outburst, was harmless error./3 Even under Remmer, the presumption is "rebutted if the court finds that there was no 'reasonable possibility' that the verdict was affected by the contact." See United States v. Sanders, 962 F.2d 660, 668 (7th Cir. 1992) (quoting United States v. Bruscino, 687 F.2d 938, 940 (7th Cir. 1982) (en banc)). "Factors that the court should look to in making this determination include the extent and nature of the unauthorized contact, the power of curative instructions, and the responses of the jury." Id. at 668-69.

The extent and nature of the unauthorized contact, and the trial court's curative instruction, leave no reasonable possibility that the verdict was affected by the contact. Although the events occurred off the record, their nature and the curative instruction indicate that an evidentiary hearing into the responses of the jury was not required. Cf. Porter v. Gramley, 112 F.3d 1308, 1318 (7th Cir. 1997) (record was insufficient to show actual juror bias in case where court assumed the trial court conducted an inadequate hearing on juror bias). In short, the harmlessness of the mother's outburst precludes habeas relief.

C.  Prosecutorial Misconduct

Whitehead next alleges that several comments by the prosecutor during closing arguments deprived him of his due process right to a fair trial under the Fifth and Fourteenth Amendments.

Before we reach the merits of these misconduct claims, we first address a procedural argument raised by the government. The government argues that the district court erred in holding that Whitehead's prosecutorial misconduct claims were not procedurally defaulted because they had been fairly presented to the state court. According to the government, these claims should have been barred under the independent and adequate state grounds doctrine.

When Whitehead raised his prosecutorial misconduct claims on direct appeal, the Illinois Supreme Court determined they were waived because Whitehead had not objected to the remarks during trial or in his post-trial brief, thus foreclosing his claims under Illinois law. See Whitehead I, 508 N.E.2d at 687, 694-95. The Illinois Supreme Court's ruling thus constitutes an independent and adequate state ground for its decision, and bars federal review of the issue. See Franklin v. Gilmore, 188 F.3d 877, 886 (7th Cir. 1999); Coleman v. Thompson, 501 U.S. 722, 729 (1991). In order to avoid this bar, the habeas petitioner must demonstrate cause for the default and actual prejudice resulting from the alleged violation of federal law, or else demonstrate that failure to consider his claims would result in a fundamental miscarriage of justice. See id. at 750.

As the Supreme Court noted in Coleman, "[w]hen the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, an additional concern comes into play. This Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims." 501 U.S. at 731. "[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims

are presented to the federal courts." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Accordingly, the petitioner must "fairly present" the federal issue to the state courts as a precondition to exhaustion. See Verdin v. O'Leary, 972 F.2d 1467, 1472-73 (7th Cir. 1992).

In Verdin, this court adopted the following test for fair presentment:

If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of any one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

972 F.2d at 1473-74 (quoting Pierson v. O'Leary, 959 F.2d 1385, 1393 (7th Cir. 1992)) (quotation marks omitted).

The district court reached the same conclusion we do, namely, that there was an independent and adequate state ground for the Illinois Supreme Court's decision. The district court, nevertheless, concluded that Whitehead avoided this bar because he met the standards for "fair presentment" of his claim in state court. Applying our decision in Verdin, the district court determined that Whitehead had fairly presented his Fifth Amendment prosecutorial misconduct argument by presenting it as a legal predicate for his Sixth Amendment ineffective assistance of counsel claim in his post-conviction proceeding, and by presenting the state court with the facts of the Fifth Amendment claim. Accordingly, the district court determined that it was appropriate to reach the merits on habeas review.

The government argues that the district court misapplied Verdin, and claims that

Whitehead did not present the operative facts and controlling legal principles of a constitutional claim to the state courts. Cf. Bocian v. Godinez, 101 F.3d 465, 469 (7th Cir. 1996). In essence, the government contends that the constitutional claim presented in thefederal proceeding was not the same claim as the claim presented in the state proceeding. In support of its application of the "fair presentment" doctrine to the ineffective assistance claim, however, the district court looked to similar holdings in the Fourth and Eighth Circuits, where an ineffective assistance of counsel claim was held to fairly present an underlying constitutional claim. See Ramdass v. Angelone, 187 F.3d 396, 409 (4th Cir. 1999), aff'd on different grounds, 530 U.S. 156 (2000); Odem v. Hopkins, 192 F.3d 772, 775-76 (8th Cir. 1999). The government did not discuss these cases in its brief.

We need not decide whether Whitehead's claims of prosecutorial misconduct are barred, since the prosecutorial comments at issue do not result in a denial of due process under the circumstances of this case. First, Whitehead claims that the prosecutor improperly commented on Whitehead's failure to testify. This argument is based on several prosecution statements. At one point, the prosecutor stated that the jury should not "listen to facts that have not been introduced in evidence . . . . Unless that witness has been sworn up there on the witness stand you will not have had the opportunity to observe the demeanor of the witness." In context, these comments allegedly implicated the petitioner, who had not testified. Subsequently, the prosecutor stated: "What do you have before you? Unrebutted, undenied, uncontradicted that the defendant both in a tape recorded statement and a written statement admitted [drowning] Vickie Wrobel . . . . Not one piece of evidence put on by either party contradicts that." Whitehead contends that these comments violated the Fifth Amendment because they were inappropriate remarks on his decision not to testify at trial.

Whitehead also claims that the state improperly questioned trial counsel's sincerity by commenting, "[f]inally, they present to you a defense of intoxication, but it is as little believed by them as

it should be by you." In addition, Whitehead argues that the prosecutor misstated the law by suggesting to the jury that defendant's defenses of intoxication and a guilty third party were sufficient only if the jury believed both defenses. The prosecutor had declared that the "defense tactic is to place a number of defenses in front of you, because they all have to work or none of them work. . . . They are both contradictory and yet they have to stand together under the defense's theory."

In Darden v. Wainwright, 477 U.S. 168 (1986), the Supreme Court set forth the test for when prosecutorial misconduct at trial is so egregious that it requires a new trial as a matter of constitutional law. In applying this test, we follow a two-step course:

We first look at the comments in isolation to determine if they were improper. If we find the comments are proper, the analysis ends. If we find they are improper, we must then examine the comments in light of the record as a whole to determine whether the comments deprived the defendant of a fair trial.

United States v. Whitaker, 127 F.3d 595, 606 (7th Cir. 1997). If the comments were improper, there are then six factors which courts must consider: 1) whether the prosecutor misstated the evidence; 2) whether the remarks implicate specific rights of the accused; 3) whether the defense invited the response; 4) the trial court's instructions; 5) the weight of the evidence against the defendant; and 6) the defendant's opportunity to rebut. See Howard v. Gramley, 225 F.3d 784, 793 (7th Cir. 2000).

In making this determination, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . . The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (citation and quotation omitted). As this court has explained, "the most important of the Darden factors is the weight of the evidence against the defendant." Howard, 225 F.3d at 793. "'Strong evidence of guilt eliminates any lingering doubt that the prosecutor's

remarks unfairly prejudiced the jury's deliberations.'" Rodriguez v. Peters, 63 F.3d 546, 558 (7th Cir. 1995) (quoting United States v. Gonzalez, 933 F.2d 417, 431-32 (7th Cir. 1991)).

In this case, any misconduct which may have occurred, in isolation or cumulatively, would not meet the Darden test for a due process violation. The evidence against Whitehead leaves no lingering doubts that the prosecutor's remarks prejudiced the jury. The Illinois Supreme Court rightly pointed out that Whitehead's "numerous confessions, and the physical evidence tying the defendant to the scene of the murder and linking the victim with the car in defendant's possession" provided overwhelming evidence of guilt.

Whitehead's strongest claim is that the prosecution improperly stated in rebuttal that "the defense tactic is to place a number of defenses in front of you, because they all have to work or none of them work. . . . They are both contradictory and yet they have to stand together under the defense's theory." Technically, this prosecutorial comment may actually be a mischaracterization of "the defense's theory," rather than a description of the law's requirements. But either way it could imply a false legal standard to a juror. Whitehead argues that a misstatement of law by a prosecutor can invalidate a conviction, citing United States v. Mackey, 571 F.2d 376, 384 (7th Cir. 1978). This is true. However, this case is readily distinguishable from the precedents relied on in Mackey for that rule, which involved misstatements of law that were reinforced by the trial court, or misstatements of law that were repeated several times to the jury. Moreover, the weight of the evidence against Whitehead renders this prosecutorial statement insignificant. We accordingly agree with the Illinois Supreme Court on this issue. As that court noted:

[T]he defendant's theories of defense were far too weak to overcome the overwhelming evidence of his guilt: there was no evidence to support the defendant's theory that he was framed by a jealous husband, with whose wife the defendant was having an affair, and the defendant's ability to drive Esther

Harmon's automobile and successfully navigate paths and roads from the Mazon River to the home of Samuel Starbuck enfeebled the intoxication defense. . . . It should be noted also that the trial court accurately instructed the jury on the law regarding the defendant's theories of innocence.

Whitehead I, 508 N.E.2d at 696.

In short, it is unlikely that the prosecutor's alleged misstatement of the law had any impact on the jury's deliberations in light of the evidence against Whitehead. Similarly, the claimed attack on defense counsel's sincerity could not have had any effect in this case. Cf. Rodriguez, 63 F.3d at 560 (reaching same conclusion where prosecutor accused defense counsel of being a liar). Nor do we think the comments on the uncontradicted nature of the government's evidence, or the absence of a witness for the defense, deprived Whitehead of a fair trial in light of the weight of the evidence. Whitehead has failed to meet the standard set forth by the Supreme Court in Darden./4 Accordingly, even if we assume the claims of prosecutorial misconduct are not barred, they are insufficient to require the grant of habeas relief.

D.  Ineffective Assistance of Counsel

Whitehead also claims that he received ineffective assistance of trial and appellate counsel in the state court pro ceedings, in violation of the Sixth and Fourteenth Amendments. In support, Whitehead presents several categories of alleged failings of counsel, set forth below.

Whitehead's first argument is that trial counsel failed to effectively prepare a defense or present evidence in support of that defense. He contends that counsel did not investigate or introduce available documentary evidence to support a defense that he was "wrongfully blamed or framed" for the murder of Vickie Wrobel. He also contends that the State Crime Lab determined that pubic hair found on the victim's panties and a blanket in Esther Harmon's car were not from Whitehead, and that trial counsel never mentioned this evidence at trial./5 Finally, Whitehead claims that

trial counsel failed to investigate evidence which supposedly showed that the shirt found in the Mazon River was not circumstantial evidence of guilt.

Next, Whitehead argues that trial counsel was ineffective because he did not call Dr. Ziporyn at trial, when Dr. Ziporyn had prepared a report and offered an opinion that at the time of the offense Whitehead was incapable of conforming his conduct to the requirements of the law. The insanity defense was abandoned when the trial court informed counsel that Whitehead's statements to Dr. Ziporyn about prior knife attacks on young girls could be brought out by the prosecution on cross-examination of Dr. Ziporyn. Whitehead claims trial counsel should have been able to prevent such statements from being admitted under Illinois law. In addition, he claims ineffective assistance because trial counsel had promised to present an insanity defense in his opening statement.

Whitehead also argues that trial counsel had been surprised when the state tendered these materials regarding his statements to the psychiatrist, and that counsel should have been fully apprised of all the materials that the state intended to use. Furthermore, Whitehead claims that trial counsel had already elicited evidence of other alleged crimes involving rape and arson during cross-examination of LeAllen Starbuck. Therefore, he contends that the insanity defense should not have been abandoned, since "the damaging evidence was already heard by the jury." Whitehead also declares that trial counsel failed to present a theory or evidence capable of supporting a not-guilty verdict because trial counsel believed that it was conducting an insanity defense. Whitehead contends that when the last-minute decision to abandon an insanity defense was made, it was too late to then call witnesses to present evidence in support of other defenses.

The Supreme Court set forth the requirements for an ineffective assistance of counsel claim in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, the petitioner must demonstrate 1) that his counsel's performance was deficient, such that

under the circumstances it was unreasonable under prevailing professional norms, and 2) that he was prejudiced by his counsel's deficient performance. As we noted in Holman v Gilmore, "Strickland calls for inquiry into degrees; it is a balancing rather than a bright-line approach . . . . This means that only a clear error in applying Strickland's standard would support a writ of habeas corpus." 126 F.3d 876, 881 (7th Cir. 1997). This is because "Strickland builds in an element of deference to counsel's choices in conducting the litigation [and] sec. 2254(d)(1) adds a layer of respect for a state court's application of the legal standard." Id.

We won't go through all of the details of the Illinois Supreme Court's lengthy analysis of this issue, but we find persuasive the Illinois Supreme Court's thorough and well-reasoned treatment of Whitehead's claims of ineffective assistance of trial counsel. The court rejected an argument that Whitehead's counsel conducted an inadequate investigation, based on substantial contrary evidence in the record. Whitehead II, 662 N.E.2d at 1322. The court determined that the insanity defense would necessarily have made available evidence of prior acts by Whitehead as evidence of his state of mind. Accordingly, it concluded that trial counsel erred by failing to appreciate the damage potential of Dr. Ziporyn's testimony, and therefore apparently "made an error of judgment in raising the insanity defense." See id. at 1319-20. Nevertheless, it also concluded that trial counsel was not incompetent based on this error, and had made a reasonable strategic decision in subsequently abandoning the insanity defense. See id. at 1320. Furthermore, the court found that trial counsel had relied primarily on a theory that defendant was innocent, and that trial counsel's theory was supported with well-argued motions and vigorous cross-examination. See id. at 1322. Most significantly, though, the Illinois Supreme Court concluded that the second prong of the Strickland test was decisive in this case. As the court noted:

What is offered by defendant pales beside the overwhelming evidence of guilt based

on findings unaffected by error. Our review of this record convinces us that confidence in the outcome is not undermined even assuming the claimed errors. We conclude that trial counsel was not ineffective in investigating, presenting and arguing evidence in support of reasonable doubt.

Id. at 1323.

We agree with the Illinois Supreme Court and, moreover, conclude that Whitehead has not met his burden in this court of showing clear error. Accordingly, his claims of ineffective assistance of trial counsel must fail.

Whitehead also claims that his appellate counsel was ineffective for failing to recognize constitutional deficiencies and for not bringing them to the attention of the state reviewing court. Again, the Illinois Supreme Court found otherwise, and Whitehead's brief makes no argument why this ruling was clear error. In fact, Whitehead does not state in his appellate briefs before this court what the errors were which his appellate counsel in state court made. As we have stated previously, "[a]ppellate lawyers are clearly not incompetent when they refuse to follow a 'kitchen sink' approach to the issues on appeals." Howard, 225 F.3d at 791. They certainly do not have to present losing arguments. Apparently, Whitehead's argument to the district court was that his appellate counsel failed to present arguments that his trial counsel was ineffective. The district court rightly noted that the ineffective assistance of trial counsel argument would have failed, and accordingly, concluded that appellate counsel was not ineffective. We affirm this holding.

E.   One-Juror Rule

Whitehead made the apparently reasoned decision to avoid having his sentence determined by the jury, which had returned a finding of guilt in a mere fifteen minutes. It appears, also, that counsel for Whitehead believed the trial judge was an outspoken opponent of capital punishment. Nevertheless, the sentencing judge imposed the death penalty.

Whitehead argues that his waiver of the

right to have a jury decide whether to impose the death penalty was constitutionally invalid. In Illinois, when a jury deliberates on the appropriateness of the death penalty at sentencing, its decision must be unanimous. However, if a single juror votes against the death penalty, it cannot be imposed. See 720 ILCS 5/9-1(g). This rule is known as the "one-juror rule." In contrast, if there is a single dissenting juror in a felony trial, "the defendant is not acquitted, but a mistrial is declared and the prosecution can start over with a new jury." See People v. Hall, 499 N.E.2d 1335, 1355 (Ill. 1986) (Simon, J., dissenting) ("Hall I").

Whitehead claims he was misled when he opted for the judge instead of the jury because the trial court did not explain the way the "one-juror rule" functions. In this case, the trial court stated, "And those twelve people would decide whether or not you should receive the death penalty if they were to be your jury. Do you understand that?" Whitehead responded, "Yes, I do." The Illinois Supreme Court, however, concluded that the trial court's instructions were not misleading, and has previously ruled that there is no requirement that a trial judge provide a "specific admonition that the decision to impose the death penalty must be unanimous." See Whitehead I, 508 N.E.2d at 697. Accordingly, it denied Whitehead's claim that his waiver of a sentencing jury was not knowingly and intelligently made.

We may not infer a waiver of the right to a jury trial from a silent record, see United States ex rel. Wandick v. Chrans, 869 F.2d 1084, 1087 (7th Cir. 1989) (citing Carnley v. Cochran, 369 U.S. 506, 516 (1962)), but the burden is on the defendant to show that a waiver was not knowingly and intelligently made. See id. (citing Adams v. United States ex rel. McCann, 317 U.S. 269, 281 (1942)). In the context of waiver of the right to a jury trial, we have held that the trial judge need not explain the ramifications of a waiver in terms of the number of votes required for conviction or acquittal. As this court has noted, a constitutionally valid waiver of the right to a jury trial does not require the defendant, for example, to have an "awareness of [the]

participation and substantial majority attributes of a jury trial." Wandick, 869 F.2d at 1088. Instead, he need only have a concrete knowledge of the right being waived. See United States ex rel. Williams v. DeRobertis, 715 F.2d 1174, 1180 n.3 (7th Cir. 1983). Cf. United States v. Hill, 2001 WL 608963 (7th Cir. 2001) ("Waiver does not depend on astute (or even rudimentary) understanding of how rights can be employed to best advantage. Defendants routinely plead guilty, waiving oodles of constitutional rights, in proceedings where the rights are named but not explained. For example, the judge will tell the defendant that the plea waives the right to a jury trial, but will not describe how juries work, when they are apt to find a prosecutor's case insufficient, why the process of formulating and giving jury instructions creates issues for appeal, and so on.").

Whitehead seeks to distinguish Wandick and DeRobertis, claiming that a defendant will assume that the voting process is the same for a trial jury and a sentencing jury unless the defendant is informed of the one-juror rule. This view is not a novel one. See Hall I, 499 N.E.2d at 1355 (Simon, J., dissenting). However, in Enoch v. Gramley, 70 F.3d 1490, 1506 (7th Cir. 1995), we addressed a trial court's instruction which stated that the sentencing jury would have to be unanimous in favor of the death penalty in order to impose it (not mentioning that the jury did not have to be unanimous for him to avoid the death penalty). The Enoch court held that it was not reasonable to conclude based on this instruction that unanimity was required to avoid the death penalty. Accordingly, the instruction did not render the waiver invalid. There is no reason to think the likelihood of misunderstanding is greater here than it was in Enoch.

Whitehead presents us with no evidence that counsel failed to advise him regarding his choice to waive a sentencing jury. Cf. Hall v. Washington, 106 F.3d 742, 746 (7th Cir. 1997) ("Hall II") (the record indicated that Hall, the defendant, had received no advice from his counsel as to whether or not to choose a sentencing jury; when the trial judge sought to rectify the problem, the

defendant's counsel only spoke to him for forty seconds, "during which time they told Hall simply that he had a right to a jury at sentencing."). Nor is this a case in which the defendant was misinformed regarding the one-juror rule. See id. (counsel's explanation of jury sentencing may have suggested to defendant that juror unanimity was required both to impose or reject the death penalty); St. Pierre v. Cowan, 217 F.3d 939, 951 (7th Cir. 2000) (trial judge's ambiguous reference to unanimity could reasonably imply that unanimity was required both to impose or reject the death penalty).

In light of our interpretation of Supreme Court precedent in Wandick and DeRobertis, we conclude that the Illinois Supreme Court's holding was not contrary to, or an unreasonable application of, federal law pursuant to the requirements set forth in Williams. The Illinois Supreme Court's decision can readily be squared with clearly established Supreme Court precedent, and under the AEDPA, this is fatal to Whitehead's claim.

Although it is far from clear based on Whitehead's appellate briefs, it appears that he also claims ineffective assistance of counsel respecting his waiver of a sentencing jury. Whitehead points to no supporting affidavits or evidence from the record, but seems to claim that he received ineffective assistance because he was not advised by counsel of the one-juror rule. He cites Hall II for the proposition that such a failure constitutes ineffective assistance. Not only does Hall II not stand for Whitehead's asserted proposition, but this claim would contradict our prior holding in this area. See DeRobertis, 715 F.2d at 1182 (noting that "counsel does not have to inform a client of all of the legal and procedural knowledge which forms the basis of his professional advice," and concluding "we think that to the extent that the jury selection process and the substantial majority verdict requirement need to enter into a defendant's [jury waiver] calculus, it is sufficient that he is being advised by counsel who can be presumed to know about such matters in the absence of some showing of incompetence."). Hall II involved not only a failure to explain the one-juror

rule, but a near complete failure to advise the defendant in his sentencing choice, and a potentially misleading description of the unanimity requirement by defense counsel. See Hall II, 106 F.3d at 753. Whitehead's case is not comparable to Hall II, and Whitehead makes no effort to demonstrate that his counsel was incompetent in advising him regarding his waiver of a sentencing jury, other than his apparent claim that counsel was incompetent because he never explained the one-juror rule. In DeRobertis, we explained that, absent a showing of incompetence, "we will not postulate counsel's ignorance of . . . the fact that under Illinois law a unanimous jury is required to convict . . . ." 715 F.2d at 1182. The same reasoning applies here. Whitehead has given us no reason to postulate counsel's ignorance of the one-juror rule in this case; indeed he does not even suggest that his counsel was ignorant of the rule. Absent some suggestion that counsel was incompetent in his advice regarding waiver, Whitehead's claim of ineffective assistance must fail.

III.

In light of Whitehead's failure to show that the Illinois Supreme Court's decisions were contrary to, or an unreasonable application of, clearly established Supreme Court precedent, his petition for habeas relief must be denied. Whitehead's inculpatory statements were properly admitted; he was not deprived of a fair trial before an impartial jury; his claims of prosecutorial misconduct and ineffective ness of counsel fail in light of the overwhelming evidence of guilt; and, he failed to demonstrate an invalid waiver of a sentencing jury or ineffectiveness of counsel based on the trial court or counsel's failure to explain the one-juror rule. The district court is AFFIRMED.

FOOTNOTES

/1 In his opening brief, Whitehead also claimed that the failure to voir dire the jurors individually supported his claim, but this argument was withdrawn in Whitehead's reply brief.

/2 Whitehead also analogizes his case to Kinnamon, in which a juror expressed concerns that the

defendant appeared to be reading juror information sheets. However, although the state trial court in Kinnamon had ultimately granted a hearing on the issue, the Fifth Circuit did not hold in that case that a hearing was required. Moreover, Whitehead has presented no Supreme Court precedent that clearly establishes that a hearing is necessary on the facts of this case. Accordingly, this claim must fail.

/3 This circuit has not yet decided what standard for harmless error applies post-AEDPA: the test set forth in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which would look to whether the error had a substantial and injurious effect or influence in determining the jury's verdict; or the test set forth in Chapman v. California, 386 U.S. 18 (1967), which would look to whether the jury would have convicted Whitehead absent the error. See Gudmanson, 252 F.3d at 905 n.4. In this case, we reach the same conclusion under either standard.

/4 In addition, the prosecutor's comments do not add up to the unusual case, suggested as a possibility by the Supreme Court, where "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." See Brecht v. Abrahamson, 507 U.S. at 638 n.9.

/5 This argument was never presented to the district court in Whitehead's original or first amended petitions for habeas relief, and it is accordingly waived. See Weber v. Murphy, 15 F.3d 691, 695 (7th Cir. 1993), cert. denied, 511 U.S. 1097 (1994).