In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1208

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAYMOND M. MARTIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 09-CR-40037-JPG—**J. Phil Gilbert**, *Judge.*

ARGUED DECEMBER 2, 2011—DECIDED AUGUST 28, 2012

Before RIPPLE and ROVNER, *Circuit Judges*, and
FEINERMAN, *District Judge.**

ROVNER, *Circuit Judge*. Raymond M. Martin was the
Sheriff of Gallatin County, Illinois, from 1990 until his
conviction on fifteen counts including marijuana dis-
tribution, possession of a firearm during a drug traf-

_____

* The Honorable Gary S. Feinerman of the Northern District
of Illinois, is sitting by designation.

ficking crime, conspiracy to distribute marijuana, witness tampering, conspiracy to tamper with witnesses, and attempted structuring of financial transactions. The evidence at trial demonstrated that Martin solicited Jeremy Potts to sell marijuana supplied by Martin, with Martin taking a cut of the profits from that sale. Martin obtained the marijuana from other persons and also obtained marijuana from the Gallatin County evidence storage facilities. When Potts sought to end the relationship and discontinue selling the marijuana, Martin threatened him using his county-issued service weapon. The government obtained audio and video recordings of three deliveries of marijuana by Martin to Potts, and Martin was in uniform, in his patrol vehicle, and in possession of his service revolver for those deliveries. Martin was then arrested and charged with three counts of marijuana distribution and two counts of carrying a firearm in relation to a drug trafficking crime. While incarcerated at the jail, Martin separately solicited two inmates to kill Potts and another witness, and Martin took steps to obtain payments for the murders and to provide directions to the homes of those intended victims. Those actions formed the basis for the convictions for witness tampering and illegal structuring of financial transactions to avoid Currency Transaction Reports.

Martin raises only two challenges on appeal. First, he argues that the presence of a non-juror in the jury room for a short period of time deprived him of his right to an impartial jury. Second, he asserts that the district court committed plain error in relying on an incorrect Guidelines calculation in sentencing him.

The jury issue arises from a rather bizarre sequence of events on the second day of trial. The first day had been devoted entirely to jury selection and opening statements. The morning of the second day, one of the jurors—who hailed from Christopher, Illinois—was late for jury duty. A court security officer waiting for the late juror saw a woman, whom we will call CM, drive up, and asked CM if she was coming from Christopher. When CM replied in the affirmative, the security officer escorted her to the jury room, believing that CM was the late juror from Christopher. No one apparently asked CM if she was a juror. CM was in the jury room for no more than 5 minutes when the jurors lined up to proceed into the courtroom. CM then informed a security officer that she did not think she was supposed to be there.

When only 13 of the 14 jurors filed into the courtroom, it became apparent to the district court judge that there was a problem. The judge was informed that a non-juror had been mistakenly taken to the jury room, and the court began an investigation into the matter.

In response to questioning by the court marshal, CM had indicated that she had no connection to the case, and that she lived in Junction, Illinois. That was a cause of concern to the court and the parties, because it appeared to conflict with the statement that she was from Christopher, Illinois. In addition, she had been in the courtroom taking notes the previous day as an observer, and had a pad and pencil on this day as well. With the agreement of the parties, the judge decided to

question each juror individually to determine whether CM had communicated with them in any way in the jury room, and to question CM. The prosecutor and defense attorney elected to be present for the questioning of CM but not for the individual jurors.

Without exception, each juror testified that CM did not speak to anyone in the jury room. The consistent testimony was that she entered the jury room and, after using the restroom, went to a seat at the far end of the jury table and sat quietly there. Martin seizes upon the initial remarks of one juror that it was "a little scary" when she entered. That person acknowledged, however, that he did not talk to her or see anyone else talk to her, and when the judge queried as to whether CM realized that she was in the wrong place when the jurors walked out, that juror acknowledged "I guess so." Another juror concurred with that assessment, stating "[y]ou could tell she was feeling the same way. That she wasn't— had been sent to the wrong place."

The sole communication that CM had with a juror consisted of a brief interaction in the hallway as CM was being escorted from the jury room and the late juror was coming to the jury room. That late juror, seeing CM, asked CM if she was a late juror too and CM replied "No." There was no other testimony of any other communication between CM and any juror.

The judge, with the government and defense attorneys present, then questioned CM. She testified that she did not speak with anyone in the jury room and even asked whether there were security cameras that could

confirm her testimony (there were not.) The court then explored her connection to the case, asking why she had stated that she was not connected with the trial. The court determined that CM was not herself connected to the case, but that her husband was an unindicted coconspirator. She also clarified that the court security officer had asked her whether she had come from Christopher, not whether she was from there, and she responded affirmatively because that is where she had come from that day. Finally, CM testified that she initially thought that the security officer was taking her to a holding room as part of the court security for visitors to the courtroom. Once she realized that she did not belong there, she informed the court security officer of that fact.

After hearing the testimony from the jurors and CM, the court notified the parties that it intended to proceed with the trial. Defense counsel did not object to that determination. Martin now complains on appeal that the brief encounter of the jurors with CM deprived him of his right to an impartial jury.

Because Martin did not raise any such objection at trial, we review for plain error. *United States v. Ambrose*, 668 F.3d 943, 963 (7th Cir. 2012); *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir. 1985). Accordingly, we will reverse only if we find an error that is plain, that affects the defendant's substantial rights, and that seriously affects the fairness, integrity or public reputation of judicial proceedings, effectuating a miscarriage of justice. *Id.*; *United States v. Olano*, 507 U.S. 725, 732-34

(1993). Martin first argues that the court failed to remedy actual jury bias, asserting that such an error is a structural error that is automatically reversible. See *United States v. Warner*, 498 F.3d 666, 679 (7th Cir. 2007)(discussing structural errors not subject to harmless error analysis); *United States v. Harbin*, 250 F.3d 532, 542-43 (7th Cir. 2001). The basis for this argument is the statement by one juror that it was "a little scary" when CM entered the jury room instead of the actual 14th juror. Martin argues that because the trial involved allegations of witness tampering, it was reasonable to assume that the juror could make the connection between witness tampering and potential jury tampering, and that the juror was therefore prejudiced by that encounter. Martin reads far too much into the relatively innocuous statement that it was "a little scary" when CM came into the room. She had been escorted there by the court security officer who believed her to be the 14th juror, and the juror who made the statement knew that she was not a juror. In that context the juror described the situation as "a little scary." That same juror appeared to agree with the judge's statement that CM then realized that she did not belong there. No follow-up statements by the juror indicated any concerns once CM separated herself from the jurors. Moreover, the court repeated to many of the jurors that CM's presence there was the fault of the court security officer, not CM. Although the court allowed CM to remain in the courtroom as a spectator afterward to take notes, there is no reason to believe that her presence would cause concern among the jurors. In fact, CM's continued

presence in the courtroom would indicate to the jury that the court at least did not perceive her to present a threat. There is simply no evidence of actual bias here.

We are left then with Martin's more general claim of improper jury tampering. We have repeatedly held that alleged errors related to improper communication with jurors do not constitute structural errors subject to automatic reversal, but rather are the type of trial errors subject to the harmless error standard. *Warner*, 498 F.3d at 679; *Whitehead v. Cowan*, 263 F.3d 708, 722 (7th Cir. 2001); see also *Olano*, 507 U.S. at 737-38. Because Martin failed to object, as pointed out earlier he must meet the plain error standard.

Martin's argument in this area relates to the court's handling of the allegedly improper contact with the jurors. Martin argues that the court applied the incorrect legal standard under *Remmer v. United States*, 347 U.S. 227, 229 (1954), in that it presumed that the contact was not prejudicial, and that the court improperly focused only on the facts of the contact and failed to inquire as to the effect of that contact on the jurors.

In *Remmer*, the Supreme Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Id.* at 229. That presumption of prejudice may be rebutted if the

government demonstrates that the contact was harmless. *Id.* The Court further held that in cases of such tampering, the trial court should conduct a hearing to determine the circumstances, the impact upon the juror, and whether or not it was prejudicial. *Id.* at 229-30.

District courts nevertheless retain some flexibility in determining the type of inquiry appropriate in a case alleging such improper communications. *Warner*, 498 F.3d at 680. Where a comment heard by a juror was ambiguous or innocuous, no *Remmer* hearing may be necessary. *Id.*; *Whitehead*, 263 F.3d at 725-6. For instance, in *Whitehead*, the defendant complained of an outburst overheard by the jury during the trial. The judge, counsel, and court reporter had retired to chambers, but the jury remained present in the courtroom when the mother of the victim rose and began shouting at the defendant asking him why he killed her daughter. *Id.* at 723. We noted in *Whitehead* that the mother did not attempt to persuade the jury, nor did she provide the jury with any extraneous information about the facts of the case. *Id.* at 724. Because only an innocuous comment was involved, we held that no *Remmer* hearing was necessary. *Id.* at 724-25. Nor was the off-the-record nature of the communication dispositive. *Id.* at 725. Although the absence of the judge at the time meant the judge could not observe the impact of the outburst on the jury, *Whitehead* held that the content and duration of the outburst was such that it was not reasonable to imagine that it would affect the jury's deliberation. *Id.* Mere speculation concerning prejudice to the defendant was insufficient to warrant reversal. *Id.* at 726.

Similarly, in *Brown v. Finnan*, 598 F.3d 416, 419 (7th Cir. 2010), the jury potentially could have overheard an in-court statement by the victim's mother to the effect that "the situation [was] racist." We noted in that case that the meaning of the statement was equivocal because the victim and the accused were of the same race, and that it was unclear how the jury could perceive the comment in a manner injurious to the defendant. *Id.* at 422. Because the comment was not one that would reasonably affect a reasonable juror's deliberation as to guilt or innocence, we held that no *Remmer* hearing was necessary. *Id.* at 423. We noted that a communication must be read in its context, and that no *Remmer* hearing is needed when the challenged communication is both ambiguous and innocuous. *Id.;* see also *United States v. Li Xin Wu*, 668 F.3d 882, 887 (7th Cir. 2011); *Thibodeaux*, 758 F.2d at 202.

Those cases stand in contrast to the facts presented in *Remmer*, in which a person had informed a juror that he could profit by returning a verdict favorable to the petitioner. 347 U.S. at 228. The situation in *Remmer* presented an unauthorized invasion of the jury, jeopardizing the integrity of the jury proceedings. The *Whitehead* and *Brown* cases, on the other hand, involved communications that did not threaten such an adverse impact on the jury proceedings; the communications did not provide any new information about the case to the jurors, nor did the nature of the communications create any likelihood that it would affect the deliberations.

There is even less evidence of any potential impact on the jury in the present case than was evident in *Whitehead* and *Brown*. The only jury "contact" here was CM's mere presence in the jury room while the jury was waiting to be called into the courtroom for the morning session. Because the improper contact with the jurors occurred outside the presence of the judge and counsel, the judge properly chose to question each of the jurors as well as CM to ascertain the nature of the contact and whether any inappropriate communications had taken place. The uncontradicted testimony was that no communication was made of any kind, with the exception of the one-word response to a question by a late juror as to whether she was a late juror as well. There is no evidence at all of any "communication, contact or tampering . . . about the matter pending before the jury." See *Remmer*, 347 U.S. at 229. Martin cannot contest that conclusion. Accordingly, Martin cannot succeed on his claim that the court should have taken the next step to determine whether the government had overcome the presumption that the communication was prejudicial; there was in fact no communication at all here, and therefore nothing that could have been prejudicial. Even if mere presence was deemed to be a communication of sorts under these facts, there was no need for a further inquiry because it was an ambiguous and innocuous communication if any, which we have repeatedly held merits no further inquiry. *Brown*, 598 F.3d at 423. In *Olano*, the Supreme Court rejected an argument that the mere presence of an alternate juror in deliberations presented a sufficient risk of a chilling

effect to justify a presumption of prejudice. 507 U.S. at 740-41. We have a less significant inappropriate presence in the jury room here as the presence was fleeting and did not occur at a time during which the jurors were discussing the case. There was absolutely no indication that the incident had any lasting impact on the jury. Therefore, the district court did not err in its inquiry into the potential jury tampering and in its determination that no improper communication or influence had occurred. The district court's decision to proceed with the trial was proper given the undisputed facts concerning the contact with the jurors.

The sentence, however, is more problematic, and requires a remand for resentencing. The government concedes that the court was operating under a misunderstanding regarding the Guidelines range for Counts 4 and 5, involving violations of 18 U.S.C. § 924(c) for carrying a firearm in connection with a drug trafficking crime. The Presentence Investigation Report ("PSR") stated that the Guidelines range for Count 4 was 5 years to life, and the range for Count 5 was 25 years to life, and Martin did not object to those calculations. The district court then adopted the PSR findings and sentenced Martin to life on both counts. The PSR range, however, was incorrect. Pursuant to U.S.S.G. § 2K2.4(b), for a conviction under § 924(c) the guideline sentence is the minimum term of imprisonment required by statute. See *United States v. Lucas*, 670 F.3d 784, 788 n.3 (7th Cir. 2012). The minimum term of imprisonment for Count 4 was 5 years and for Count 5 was 25 years. Accordingly, the Guidelines range for Counts 4 and 5 was

5 years and 25 years respectively, not 5 years to life and 25 years to life.

Because Martin failed to object to the calculation at the time of sentencing, we review only for plain error. As stated earlier, under the plain error standard, we reverse only if we find an error that is plain, that affects the defendant's substantial rights, and that seriously affects the fairness, integrity or public reputation of judicial proceedings. *Ambrose*, 668 F.3d at 963; *Olano*, 507 U.S. at 732-34. We have repeatedly held that "[a] sentencing based on an incorrect Guidelines range constitutes plain error and warrants a remand for resentencing, unless we have reason to believe that the error in no way affected the district court's selection of a particular sentence*." United States v. Farmer*, 543 F.3d 363, 375 (7th Cir. 2008); *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 767 (7th Cir. 2010).

Here, we have no reason to believe that the error had no impact on the sentence. The court explicitly tied the sentence to the Guidelines range, making it clear that it was imposing a sentence at the high end of the Guidelines range when it gave the consecutive life sentences. Therefore, we cannot assume that the court would have imposed the same sentence had it understood that the consecutive Guidelines range extended to 30 years rather than life. Although the court clearly wanted to impose a significant sentence, there is no way to know whether that would have been 30 years, a lower or higher number of years, or life. Therefore, we must remand for

the court to determine the sentence in light of the proper Guidelines recommendation.

The conviction is AFFIRMED and the sentence is VACATED. The case is REMANDED for resentencing in consideration of the proper Guidelines range.