In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1492

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH SANDIDGE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:12-cr-00159 — **Rudy Lozano**, *Judge.*

ARGUED DECEMBER 5, 2014 — DECIDED APRIL 20, 2015

Before FLAUM, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* In December 2013, Appellant Kenneth Sandidge pled guilty to one count of being a felon in possession of a firearm. On appeal, he raises four challenges to his sentence. He argues that the district court erred: (1) in applying a 4-level enhancement to his base offense level; (2) in denying him a 3-level reduction in his base offense level; (3) in imposing his federal sentence to run consecutively with an undischarged state sentence; and (4) in imposing a

number of conditions of supervised release. For the reasons that follow, we affirm in part and vacate and remand in part.

## I. BACKGROUND

During the early morning hours of April 22, 2012, sheriff's deputies from Lake County, Indiana, responded to an emergency call on the 4400 block of Grant Street in Gary, Indiana. During that response, the officers discovered and confiscated a loaded .32 caliber Smith & Wesson revolver in Sandidge's residence. Because Sandidge had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, subsection (g)(1) of 18 U.S.C. § 922 prohibited him from possessing that firearm. Sandidge pled guilty to one count of violating that statute on December 2, 2013, pursuant to an open plea.

The U.S. Probation Department ("Probation") prepared a presentence investigation report ("PSR") in advance of Sandidge's sentencing hearing. Probation calculated a base offense level of 20, per U.S.S.G. § 2K2.1(a)(4), because Sandidge obtained this felon-in-possession conviction after having previously been convicted of a crime of violence.[1]

Probation recommended applying a 4-level enhancement to Sandidge's base offense level, pursuant to U.S.S.G. § 2K2.1(b)(6)(B). That section provides for a 4-level increase to a defendant's base offense level if he used or possessed the subject firearm "in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). Probation contended that during the incident that led to the April 22 emergency call, Sandidge

---

[1] In 2007, Sandidge was convicted in Lake County, Indiana, of pointing a loaded firearm. *See* Case No. 45G011006FC00071.

had pointed the loaded revolver at another person. If he had, that would constitute a felony violation of Indiana law, and would render him eligible for the 4-level enhancement. *See* I.C. 35-47-4-3(b) ("A person who knowingly or intentionally points a firearm at another person commits a Class D felony."). Sandidge timely submitted written objections to the application of this enhancement.

Per U.S.S.G. § 3E1.1, Probation also recommended a 3-level reduction to Sandidge's base offense level for acceptance of responsibility. This, combined with the 4-level enhancement, resulted in a recommended offense level of 21. Sandidge had 10 criminal history points, and a consequent criminal history category of V. Sandidge's resultant recommended Guidelines range was 70 to 87 months' imprisonment.

### A.  *Officer William Poe's Testimony*

Sandidge's sentencing hearing was held on February 26, 2014. First at issue was the imposition of the 4-level firearm enhancement. In order for the enhancement to apply, the government was required to prove by a preponderance of the evidence that Sandidge had pointed the loaded firearm at another person. That fact would establish that the firearm was used "in connection with another felony" under U.S.S.G. § 2K2.1(b)(6)(B). Sandidge denied having done so.

The government offered the testimony of two witnesses, as well as documentary evidence, to prove the conduct underlying the enhancement. The district court first heard testimony from Officer William Poe of the Lake County Sheriff's Department. Through direct and cross-examination, as well as through questioning by the district judge, Officer Poe

testified to the following account of the events of April 22, 2012.

At 3:26 a.m., Officer Poe was dispatched to 4454 Grant Street in Gary, Indiana. The dispatch was based on an emergency call reporting that a female subject was running and screaming down Grant Street. She was knocking on doors, begging for help and for someone to call the police. Officer Poe made contact with the subject—Barbara Harris—as soon as he arrived. Consistent with the initial report, Officer Poe found Harris crying, distraught, and frightened.

Harris told Officer Poe that a black male had chased her with a gun and had attempted to kill her. She recounted that she had been drinking with that man, whom she knew as "Kenny Mo," and that she had fled from his residence. While she did not know the precise address of the house, she was able to provide Officer Poe with its general location and description. Officer Poe placed Harris in the back of his police vehicle, and they began to drive up Grant Street toward the residence.

As Officer Poe and Harris drove, another sheriff's deputy, Officer Solomon, stopped a black male who was riding a bicycle along Grant Street. Officer Solomon identified the subject as Kenneth Sandidge. The officer ran a warrant check on Sandidge and released him when no warrants were discovered. Officer Poe and Harris witnessed that stop from inside Officer Poe's police vehicle.[2] From her vantage point in the vehicle, Harris indicated that she could not get a good look

---

[2] The details regarding the timing of Harris and Officer Poe's arrival on the scene and their proximity to the stop are not clear from the record.

at the subject who was stopped, so she could not say whether Sandidge was the man she knew as Kenny Mo.

Officer Poe and Harris then continued to drive along Grant Street and ultimately arrived at the residence identified by Harris as Kenny Mo's. After running the license plate of a vehicle parked in front, Officer Poe discovered it was registered to Kenneth Sandidge. He pulled up a photo of Sandidge on his in-vehicle computer system, and Harris identified him as Kenny Mo.

Officer Poe called for backup officers, and as he waited for them to arrive, Harris provided the following additional details of the evening's events. According to Harris, earlier that evening, Sandidge had picked her up from her home and brought her to his Grant Street residence. While seated on a leather couch in Sandidge's living room, the two had a few drinks. Sandidge drank wine, and Harris drank two shots of vodka. Harris described the layout of Sandidge's home and stated that a black dog was chained in the kitchen area. She also stated that Sandidge told her he had recently been released from jail.

At some point in the evening, Sandidge went into his bedroom to change clothes and emerged wearing a robe. He then told Harris to take off her clothes and make herself comfortable. After advising Sandidge that she "wasn't there for that," Harris tried to leave. A struggle ensued, with Sandidge pulling Harris's jacket and pushing her down on the couch. He went back into his bedroom and returned holding a silver revolver, which he pointed at Harris's head. He told her she was not leaving, and that "[people] are dropping like flies around here. I'm not playing with you."

Sandidge then sat down next to Harris on the couch and advised her to "give him head." Harris refused, and another struggle ensued. She was able to escape from the residence through the front door as Sandidge threatened to release his dog on her. She ran down Grant Street, and was able to gain the assistance of another resident, who called the police. Harris told Officer Poe that she did not engage in any sexual activity with Sandidge, despite his attempts to force such contact.

When Officer Solomon arrived as backup, he and Officer Poe made contact with Sandidge at his residence. Sandidge first denied any involvement with Harris. After continued discussion, Sandidge changed his story, saying that Harris had been there to clean his house. He stated that she left because she became ill. After being questioned as to why Harris would be cleaning Sandidge's home at 3:00 in the morning, Sandidge stated that he would "come out and tell the truth." He said that he and Harris had first been drinking at the home of another individual, and had then relocated to Sandidge's house. He acknowledged that he was "trying to hook up with" Harris, hoping to engage in sexual intercourse or oral sex. She had become ill, however, and left. When asked why he had been riding his bike down the block at 3:00 in the morning, Sandidge told Officer Poe that he "does that sometimes."

In Sandidge's living room, the officers discovered in plain view a silver .32 caliber Smith & Wesson revolver wedged between the cushions of a leather couch. It was fully loaded. The officers seized the weapon, and Harris identified that firearm as being the one Sandidge pointed at her during their encounter.

*B. Other Evidence Offered at the Sentencing Hearing*

Following Officer Poe's testimony, the court then heard testimony from Special Agent Jason Gore of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Agent Gore conducted a recorded interview of Harris in October 2012. He testified to the following account of that interview.[3]

On April 22, Harris was at the home of a man named Don, along with several other individuals, when Sandidge arrived. Sandidge came with the apparent purpose of selling crack cocaine. Sandidge collected money from those present who wished to buy crack. He indicated that he would leave to make the buy and would return with the drugs. Harris accompanied Sandidge in order to ensure he did not abscond with the money or the drugs.

After completing the drug buy, Harris and Sandidge drove to Sandidge's house. Sandidge indicated that he needed to feed his dog and complete a few other short errands. Sandidge and Harris had a few drinks. At some point, Sandidge entered his bedroom and emerged wearing a robe. He then attempted to force Harris to perform oral sex on him. When she refused, he retrieved a silver revolver from his bedroom and pointed it at her head. Sandidge then sexually assaulted her at gunpoint, first on the couch, and then in his bedroom.

Following the assault, a woman knocked on Sandidge's door. As Sandidge spoke to the woman, Harris put on her

---

[3] As Sandidge's arguments on appeal concern the ways in which Harris's accounts to Officer Poe and Agent Gore differed, we largely confine our discussion to those relevant facts.

clothes. When Sandidge unlocked the front door in order to speak to the newly arrived woman, Harris pushed past him and ran outside.

After hearing the testimony from Officer Poe and Agent Gore, the judge took a recess in order to listen to the recorded interview between Agent Gore and Harris. He also reviewed the other materials submitted by the parties, including the investigative reports written by Agent Gore and Officer Poe.

### C. Imposition of Sentence

After returning from recess, the district court heard Sandidge's objections to the imposition of the 4-level firearm enhancement. Sandidge argued that he never pointed the loaded firearm at Harris and that the government had not met its burden to prove that the felonious conduct had occurred. Sandidge's arguments focused on the differences between Harris's two accounts of the April 22 events, as related to Officer Poe and Agent Gore. Because those accounts differed, Sandidge argued, Harris must be a liar. As such, the argument goes, the information provided by her was neither reliable nor credible. Sandidge emphasized his opinion that the government chose not to call Harris as a sentencing witness in an attempt to shield her from an adverse credibility determination by the district court.

After hearing Sandidge's objections and the government's response, the court found by a preponderance of the evidence that Sandidge had pointed a loaded firearm at Harris during the April 22 incident. Consequently, the court found that the firearm was used in connection with another felony.

Because that act constituted a felony violation of Indiana law, the court applied the 4-level enhancement.

The court then heard related argument as to whether Sandidge should receive a 3-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. The government argued that Sandidge was no longer eligible for the acceptance-of-responsibility reduction because he had falsely denied "relevant conduct"—that he had pointed the loaded weapon at Harris. Sandidge asked the court to exercise its discretion to grant him the 3-level reduction, arguing that he had accepted responsibility for possessing the firearm. The court found that Sandidge had falsely denied the relevant conduct, and it denied Sandidge the 3-level reduction.

The court then calculated Sandidge's Guidelines range. With the base offense level of 20, 4-level enhancement, and denial of the 3-level reduction, the court determined Sandidge's offense level to be 24. That, combined with his criminal history category V, resulted in a recommended range of 92 to 115 months' imprisonment.

Sandidge requested a below-Guidelines sentence of 46 months, arguing that a within-Guidelines sentence would be excessive. He also requested that his federal sentence be imposed to run concurrently with an unrelated state sentence that he was serving at that time.

The court sentenced Sandidge to a period of 92 months' incarceration, to be served consecutively with his undischarged state sentence. It also imposed a period of 2 years' supervised release, subject to a number of supervised release conditions.

## II. ANALYSIS

Sandidge challenges four aspects of his sentence: (1) the application of the 4-level enhancement; (2) the denial of the 3-level reduction for acceptance of responsibility; (3) the imposition of his federal sentence to run consecutively with his undischarged state sentence; and (4) the imposition of certain conditions of supervised release. We consider each in turn.

### A. The 4-Level Enhancement

On appeal of a sentencing enhancement, we review the sentencing court's factual findings for clear error. *United States v. McCauley*, 659 F.3d 645, 652 (7th Cir. 2011). We will reverse a district court's factual findings "only if a review of the evidence leaves us with the definite and firm conviction that a mistake has been made." *United States v. Johnson*, 765 F.3d 702, 708 (7th Cir. 2014) (quoting *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007)) (internal quotation marks omitted). We review *de novo* the application of those factual findings to the Sentencing Guidelines. *McCauley*, 659 F.3d at 652.

U.S.S.G. § 2K2.1 outlines the base offense level calculation for crimes involving the unlawful receipt, possession, or transportation of firearms or ammunition. *See* U.S.S.G. § 2K2.1. Subsection 2K2.1(b)(6)(B) provides that "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense," the base offense level for the unlawful possession should be increased by four levels. U.S.S.G. § 2K2.1(b)(6)(B). The Guidelines define the term "another felony offense" to include "any federal, state, or local offense, other than the explosive or firearms

possession or trafficking offense, punishable by imprison-ment for a term exceeding one year." U.S.S.G. § 2K2.1 n.14(C). This enhancement may be applied regardless of whether a charge was brought or a conviction obtained for the other felony offense. *Id*. In order to apply the enhance-ment, the government bears the burden of proving by a pre-ponderance of the evidence that the felonious conduct oc-curred. *Johnson*, 765 F.3d at 708.

In making its factual determinations, a sentencing court "may consider relevant information without regard to the rules of evidence … provided that the information has suffi-cient indicia of reliability to support its probable accuracy." *United States v. Hankton*, 432 F.3d 779, 789 (7th Cir. 2005) (quoting *United States v. Lemmons*, 230 F.3d 263, 267 (7th Cir. 2000)) (internal quotation marks omitted); *see also* U.S.S.G. § 6A1.3. The court may, for example, consider hearsay evi-dence that would be inadmissible at trial. *See United States v. Davila-Rodriguez*, 468 F.3d 1012, 1014 (7th Cir. 2006); *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005).

Sandidge argues that the district court clearly erred in its factual finding that he pointed a loaded firearm at Harris. Sandidge contends that this finding is clearly erroneous, be-cause the district court relied on unreliable hearsay evidence in reaching its conclusion. As such, Sandidge argues that the application of the 4-level enhancement was improper.

Specifically, Sandidge takes issue with portions of the tes-timony provided by Officer Poe and Agent Gore. He seems to concede that the officers were credible witnesses, as were their accounts of the events they personally saw or partici-pated in. Sandidge challenges, however, the court's consid-

eration of Harris's hearsay statements as relayed by the officers.

Sandidge appears to argue that because Harris's accounts to Officer Poe and Agent Gore differed in some respects, any and all of Harris's statements were necessarily unreliable: in short, the discrepancies in her stories rendered the entire accounts unreliable, and therefore inadmissible. Indeed, Sandidge claims that there was "*no* reliable evidence" corroborating Harris's claim that Sandidge pointed the weapon at her. Without corroborating evidence, he argues, Harris's statements were "mere allegations" that must be wholly disregarded. Therefore, he argues, the district court clearly erred when it credited portions of Harris's hearsay statements. We disagree.

To begin, sentencing evidence need not be fully corroborated for a district court to credit it. *See United States v. Clark*, 538 F.3d 803, 813 (7th Cir. 2008) ("[A] sentencing court may credit testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing, paid government informant.") (internal quotation marks and citation omitted). Moreover, as we have previously held, a sentencing court clearly errs in considering hearsay evidence "only if the evidence was *devoid of any indicia* of reliability." *United States v. Sanchez*, 507 F.3d 532, 538 (7th Cir. 2007) (emphasis added). Indicia of reliability "may come from, *inter alia*, the provision of facts and details, corroboration by or consistency with other evidence, or the opportunity for cross-examination." *United States v. Smith*, 674 F.3d 722, 732 (7th Cir. 2012) (internal citations omitted).

The district court thoroughly reviewed all the evidence before it. Based on this review, it found Harris's provision of

facts and details to be sufficiently reliable. The court noted numerous elements of Harris's accounts that were consistent with each other, including: (1) her identification of Sandidge as the perpetrator; (2) her description of the interior of Sandidge's residence; (3) her description of the gun as a silver revolver; (4) her contention that Sandidge pointed the weapon at her head as he sought to engage in sexual activity with her; and (5) her statements that Harris and Sandidge had been drinking together while at his residence.

The court also described portions of Harris's accounts that had been corroborated by other evidence, including: (1) that the interior of Sandidge's home matched her description; (2) that Sandidge had in fact been recently released from jail, as he indicated to Harris; (3) that Sandidge admitted to Officers Poe and Solomon that he had been hoping to engage in sexual conduct with Harris; (4) that a silver revolver was found on the leather couch described by Harris; and (5) that Sandidge was found riding his bicycle down Grant Street immediately after Harris left his home.

In addition, the court considered Sandidge's explanation of the April 22 events. It concluded that his account was not credible. The court noted Sandidge's multiple and changing stories about whether and why Harris was in his home that evening. It also found incredible Sandidge's explanation for his late-night bicycle ride, as well as his contention that Harris had left that night due to illness.

And finally, the court acknowledged and then weighed the inconsistencies in Harris's accounts. Sandidge's attorney brought a number of discrepancies to the attention of the court throughout the sentencing hearing. After consideration of all of the evidence, the court found that Harris's account

was credible, particularly regarding what it identified as the "main allegation that the defendant used a firearm to demand sex and pointed the firearm at the victim."

We agree with the district court. To be sure, Harris's accounts contained some discrepancies. But those inconsistencies did not render the entirety of her statements devoid of credibility or reliability. The accounts provided by Harris supplied the court with sufficient facts and details that were both internally consistent and corroborated by other evidence. Harris's hearsay statements were sufficiently reliable to be considered at sentencing, and the court had before it sufficient corroborating evidence to so conclude.

Because the court did not commit clear error when it concluded that Sandidge pointed the loaded firearm at Harris, the application of the 4-level enhancement was proper.

*B.  The 3-Level Reduction*

As with an enhancement, we review for clear error a sentencing court's factual findings regarding an acceptance-of-responsibility reduction. *United States v. Davis*, 442 F.3d 1003, 1009 (7th Cir. 2006).

U.S.S.G. § 3E1.1 provides that if a defendant "clearly demonstrates acceptance of responsibility for his offense," then he is eligible for a decrease of either two or three offense levels. To qualify for the reduction, a defendant must "(1) demonstrate sincere remorse or contrition, (2) truthfully admit the conduct comprising the offense, and (3) neither falsely deny nor frivolously contest relevant conduct." *United States v. Eschman*, 227 F.3d 886, 891 (7th Cir. 2000). Here, Sandidge pled guilty to possession of the firearm, but, as discussed above, he denied having pointed that firearm at

Harris. The district court concluded that: (1) Sandidge point-
ed the loaded firearm at Harris; (2) Sandidge falsely denied
that conduct; and (3) the gun-pointing was "relevant con-
duct" for purposes of U.S.S.G. § 3E1.1. The district court
therefore concluded that Sandidge was not entitled to the 3-
level reduction.

Sandidge argues that he should have been given the 3-
level acceptance-of-responsibility reduction. He seems to
concede that, had he actually pointed the firearm at Harris,
such actions would constitute "relevant conduct" under the
Guidelines. Sandidge's argument on appeal, then, piggy-
backs entirely on his contention that the district court erred
in concluding that he pointed the loaded firearm at Harris.
He argues that because that finding was erroneous, so was
the denial of the acceptance-of-responsibility reduction.

We already concluded above that the district court did
not clearly err in finding that Sandidge pointed the loaded
firearm at Harris. It follows that the district court did not err
in denying Sandidge the 3-level acceptance-of-responsibility
reduction.

*C. Consecutive v. Concurrent Sentences*

At the time of sentencing for his federal offense, San-
didge was serving an unrelated state term of imprisonment.
Under the version of U.S.S.G. § 5G1.3(c) then in effect, the
district court had discretion to impose Sandidge's federal
sentence to run concurrently, partially concurrently, or con-
secutively to his undischarged state term.[4] The Guidelines

---

[4] The Guidelines have since been amended. Effective November 1, 2014,
the provision formerly housed in U.S.S.G. § 5G1.3(c) is now contained in
subsection (d).

offer these options to allow the court to "achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c).

As described above, the court correctly calculated Sandidge's Guidelines range of imprisonment as 92 to 115 months. Sandidge requested a below-Guidelines sentence of 46 months. At the sentencing hearing, his counsel outlined Sandidge's significant physical and mental health issues. In addition, counsel noted that Sandidge had admitted to possession of the offending firearm. Counsel then stated:

> I think that a sentence within the guidelines range is much too excessive in this case. It's just not necessary to promote any of the statutory purposes of sentencing. I would note that Mr. Sandidge is serving a state sentence right now … I would at least ask that Mr. Sandidge be given time in this case concurrent to the time that he has in that case.

Sandidge himself then made a statement. The government made its arguments opposing the requested 46-month sentence. After recounting Sandidge's extensive criminal history, the government recommended a within-Guidelines sentence of 92 months, and it did not at that time address Sandidge's request for a concurrent sentence.

Sandidge's counsel then reiterated his argument for a 46-month sentence and again requested that it be imposed to run concurrently with Sandidge's state sentence. He stated, "I do, you know, think that 92 months is excessive, and usually those types of sentences are handed out to criminals who have engaged in extremely violent conduct. And that's just not the case here. 92 months is excessive. At the very least, I would ask that the court impose a concurrent term."

The government responded that it opposed a concurrent term for the federal offense, given that the two crimes were unrelated.

The district court then conducted its review of the factors enumerated in 18 U.S.C. § 3553(a) ("3553(a) factors"). It first weighed the seriousness of the offense, as measured by the maximum possible punishment authorized by Congress. The court then discussed Sandidge's lengthy criminal history, stating that Sandidge had been "in and out of jail over and over and over again." It also noted that Sandidge had "caught a lot of breaks in the justice system," but had "squandered them away" by committing more crimes. In addition, the court considered the recidivist nature of Sandidge's criminal history, concluding that there was "a common thread that goes through all these cases." The judge noted, "I see drugs. I see guns. I see threats."

The district court then considered the need for Sandidge's sentence to promote respect for the law and to protect society. It concluded that Sandidge was "a menace to society right now," admonishing him that, "[y]ou're a menace to society for the reason you keep breaking the law, that you keep putting people in harm's way, that you keep getting back in trouble over and over again."

Finally, the district court discussed Sandidge's age and health conditions. It twice emphasized that, in its view, the Guidelines range was low as applied to Sandidge. In light of Sandidge's age, however, the court was inclined to impose a lower sentence. The judge stated, "[m]y first tendency when I went through your file, and I've gone through it several times, was to deviate from the guidelines and go up. You're

too old for that, Mr. Sandidge. I don't want you to die in prison."

The district court then imposed its sentence, stating "it is the judgment of the court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 92 months, to be consecutive to the term that he's now facing in the state court on … another charge."

In determining whether to impose a consecutive or concurrent sentence, courts are obligated to consider the 3553(a) factors. *United States v. Nania*, 724 F.3d 824, 830 (7th Cir. 2013); 18 U.S.C. § 3584. But courts need not make formal findings regarding each factor. *Nania*, 724 F.3d at 838; *See also United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009). The record must simply assure us that the court "thoroughly considered the statutory provisions." *Nania*, 724 F.3d at 838. We only require express findings to the extent necessary to fulfill two purposes: "(1) enabling this court to meaningfully review the district court's decision; and (2) responding to the defendant's principal, nonfrivolous arguments." *Id.* at 838 (internal quotations and citations omitted).

On appeal, Sandidge does not challenge the substantive reasonableness of either the length of his sentence or its consecutive imposition. Sandidge argues, however, that the district court's analysis of the 3553(a) factors applied only to the *length* of Sandidge's incarceration. It did not apply, he argues, to the court's decision to impose that sentence consecutively to Sandidge's state term. Sandidge also contends that the court did not address his arguments for a concurrent sentence. Therefore, he claims, the district court made *no findings* regarding his request for a concurrent sentence, and thus committed procedural error.

We review procedural challenges to the application of the Sentencing Guidelines *de novo*, and we review substantive challenges for abuse of discretion. *Nania*, 724 F.3d at 838. Because Sandidge does not raise a substantive challenge, our review here is *de novo.*[5]

The district court provided adequate findings to convince us that it considered the 3553(a) factors with respect to the sentence's consecutive imposition. We have no reason to believe that the court intended for its analysis to apply only to the sentence's length.

As an initial matter, Sandidge's only argument for a concurrent sentence was based on his contention that a within-Guidelines sentence would be excessive as applied to him.[6] As a result, Sandidge argued, his sentence should, "at the very least," be imposed to run concurrently to his undischarged state term. His argument for a concurrent sentence was therefore dependent on the length of sentence that the court found to be reasonable and appropriate.

The district court explicitly stated that the Guidelines range was reasonable in Sandidge's case. In fact, the court repeatedly stated that it contemplated imposing a sentence *above* the Guidelines range, due to Sandidge's recidivist behavior. Having found that the Guidelines range was appropriate, and not excessive, the district court necessarily reject-

---

[5] The government asks us to apply the abuse-of-discretion standard of review, but because Sandidge does not raise a substantive challenge, the *de novo* standard is appropriate.

[6] Because Sandidge's 92-month sentence represented the low end of the Guidelines range, Sandidge necessarily argued that anything short of a below-Guidelines sentence would be excessive as applied to him.

ed Sandidge's argument that "at the very least" his federal sentence should run consecutively to his state term. Because the court found that the Guidelines range was reasonable as applied to Sandidge, it had no need to seek "mitigation" of that sentence by imposing it to run concurrently with the unrelated state term.

In addition, despite the court's concerns with Sandidge's recidivist behavior, and its consideration of an above-Guidelines sentence, it imposed a sentence at the *low end* of the Guidelines range. That reinforces our conclusion that the district court considered (and rejected) Sandidge's argument that a concurrent sentence was necessary to mitigate an otherwise "excessive" within-Guidelines sentence.

The context of the district court's 3553(a) analysis also confirms that the court intended its analysis to apply both to the length of sentence and to its consecutive imposition. Before reviewing the 3553(a) factors, the court heard argument from both Sandidge and the government regarding the imposition of a concurrent or consecutive sentence. So we have no doubt that the court was aware of its discretion to impose a concurrent sentence. And immediately following its review of the 3553(a) factors, the court imposed sentence. It did so by imposing the 92-month term and its consecutive run *in the same sentence.* That timing, combined with the court's rejection of Sandidge's below-Guidelines sentence request, convinces us that the court's 3553(a) analysis applied equally to the imposition of a consecutive sentence and to the sentence's length.

Admittedly, the district court here did not expressly state that it considered Sandidge's request for a concurrent sentence. Although we find no error in that omission, we en-

courage district courts to include such express statements in the future. It is also a best practice for the court to specifically reference the Guidelines provision that it relies upon in imposing sentence. But in this case, even without such explicit statements, the highly experienced district judge's analysis satisfied both of the requirements described in *Nania*: it provided adequate findings to permit meaningful review on appeal, and it responded to Sandidge's principal arguments. Therefore, we find that the district court did not commit procedural error in imposing a consecutive sentence.

*D. Supervised Release Conditions*

Lastly, we turn to Sandidge's conditions of supervised release. Probation recommended the imposition of both standard and special conditions of supervised release, and it enumerated those recommended conditions in its PSR. The district court imposed on Sandidge a 2-year period of supervised release, and it imposed supervised release conditions that reflected those listed in the PSR. In addition to several mandatory supervised release conditions, the court stated that Sandidge "shall comply with the 15 standard conditions that have been adopted by this Court." It also imposed a number of "special" conditions.

We note that the system of supervised release followed the elimination of parole in the federal system. In our recent cases, we have called attention to several issues that have proven problematic in the administration of supervised release. *See United States v. Parrish Kappes,* Nos. 14–1223, 14–2135, 14–2482, 2015 WL 1546810 (7th Cir. Apr. 8, 2015); *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015); *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014). One issue concerns the procedural requirements for imposing supervised release

conditions. It has been the typical practice within this circuit for courts to impose conditions of supervised release with little or no explanation of the propriety of those conditions as applied to individual defendants. Our recent cases have made clear, however, that a sentencing judge is required "to evaluate the propriety of any conditions of supervised release that the judge is thinking of imposing." *Thompson*, 777 F.3d at 373. And he must do so by applying the sentencing factors listed in 18 U.S.C. § 3553(a) to the conditions under consideration. *Id.*; *see also United States v. Booker*, 543 U.S. 220 (2005); 18 U.S.C. § 3583(c).

The second issue we have addressed in recent cases involves the breadth and specificity of the supervised release conditions imposed. We have long counseled district courts to adopt precise supervised release conditions. For example, in *United States v. Scott*, we cautioned a sentencing court that it should

> do what is possible to adopt precise rules. Terms should be established by judges *ex ante*, not probation officers acting under broad delegations and subject to loose judicial review *ex post* (when the prosecutor proposes to reimprison a person for failure to comply with the probation officer's directions). Courts should do what they can to eliminate open-ended delegations.

316 F.3d 733, 736 (7th Cir. 2003). But as we have described in our recent cases, such open-ended delegations have been commonplace: they have taken the form of supervised release conditions that are so broad in scope and so vague in language that they fail to adequately describe to the defendant what conduct is prohibited.

*See Thompson,* 777 F.3d at 375, 376-80; *Siegel,* 753 F.3d at 712-16.

Both of these issues are raised by the conditions of supervised release imposed here. We review Sandidge's standard and special conditions in turn.

### 1. The Standard Conditions

The district court imposed fifteen of Sandidge's supervised release conditions in one phrase by stating that Sandidge "shall comply with the 15 standard conditions that have been adopted by this Court." The court offered no explanation as to the propriety of those conditions, and it conducted no review of the applicable 3553(a) factors. As we held in *Thompson*, this approach to the imposition of supervised release requires a remand, so we must vacate these conditions.

As we have previously described, such sentencing practices have become the norm. In fact, the district court in this case was operating under a General Order that had been in effect since November of 1999. N.D. Ind. Gen. Ord. 1999-8. That order stated that the district "now adopts the attached fifteen (15) standard conditions for both probation and supervised release." *Id*. The order also provided district courts with the prefatory language to use when imposing those conditions. *Id*. ("The specific language to be used is as follows: While on [supervised release], the defendant shall … comply with the fifteen (15) standard conditions that have been adopted by this court."). The district court used precisely that language here.

We note, however, that the Northern District of Indiana repealed this General Order (after Sandidge's sentencing) in

September of 2014, before our decision in *Thompson*. N.D. Ind. Gen. Ord. 2014-8. In its rescission, the court issued the following order:

> By consensus of the judges, in view of the judges' ongoing consideration of the appropriateness of standard conditions of supervision generally, and the awareness that the imposition of any condition of supervision must be based on an individualized determination of what is appropriate and necessary for a given defendant and his circumstances, the Court hereby RESCINDS General Order 1999-8, which adopted 15 standard conditions for probation and supervised release.

*Id.* We commend the Northern District of Indiana for this proactive approach to its supervised release procedures.

Of course, this change occurred after Sandidge's sentencing, and thus the district judge did not enjoy the benefit of the change. But we have no doubt that it will encourage the careful consideration of individual supervised release conditions going forward.

Should these "standard" conditions be reconsidered on remand, we note that we have previously found that several of those imposed on Sandidge suffer from fatal degrees of vagueness. *See Thompson*, 777 F.3d at 375, 376-80. These include, paraphrased, the requirements that Sandidge:

- Support his dependents and meet other family responsibilities;

- Notify the probation officer at least ten days prior to any change of employment;

- ▪ Not associate with any persons engaged in criminal activity, and not associate with any person convicted of a felony unless given permission to do so by the probation officer; and

- ▪ Not frequent places where controlled substances are illegally sold, used, distributed, or administered.

Without further explanation by the court, these conditions are too vague to provide adequate notice to the defendant as to what conduct is prohibited. Under *Thompson*, should any of these conditions be reimposed, they must be further defined in order to provide Sandidge with proper notice as to what conduct is prohibited.

Likewise, we have previously found that several of the conditions imposed on Sandidge are too broad to meet the statutory requirement that they "involve[ ] no greater deprivation of liberty than is reasonably necessary for the purposes set forth" in the applicable § 3553(a) provisions. *See* 18 U.S.C. § 3583(d)(2); *see also Thompson*, 777 F.3d at 375, 376-80. These include, again paraphrased, the conditions that Sandidge:

- ▪ Answer truthfully all inquiries by the probation officer; and

- ▪ Permit the probation officer to visit him at any time at home.

Should these conditions be reimposed, the district court should provide further explanation as to why such conditions are needed. This is necessary to ensure that they prohibit no further conduct than is necessary to fulfill the statutory purposes of 18 U.S.C. § 3553(a).

*2.  The Special Conditions*

The court also imposed several "special" conditions of supervised release. As with the standard conditions, the court provided no explanation as to why those conditions were appropriate. For the reasons articulated above, these conditions must also be remanded for redetermination.

In addition to the absence of explanation, at least one of the conditions also suffers from a fatal degree of vagueness, and potentially overbreadth: the court instructed Sandidge that he "shall not consume … any mood-altering substances." As we held in *Siegel*, a prohibition of mood-altering substances could, by its terms, proscribe everything from chocolate to blueberries, substances "that are not causal factors of recidivist behavior." 753 F.3d at 713-15. On remand, the court will have the opportunity to reexamine the scope of that condition, should it be reimposed, as well as the others.

We conclude by noting one issue that is not directly presented for our review today, but will undoubtedly be at issue in future cases. In its PSR, Probation suggested all of the conditions of supervised release that were ultimately imposed at sentencing. Sandidge, therefore, had prior notice of the substance of his conditions. At his sentencing hearing, however, Sandidge did not raise any substantive objections to those conditions. And he did not raise an objection to the procedural error he asserts on appeal—the district court's failure to consider any of the 3553(a) factors.

Ordinarily, a defendant's negligent failure to object to an alleged error at sentencing results in the forfeiture of that claim of error. *United States v. Martin*, 692 F.3d 760, 766 (7th Cir. 2012). While the defendant is not barred from raising that claim on appeal, under our forfeiture doctrine, the defendant's claim would be subject to plain error review. *Id.* (A properly preserved substantive challenge would be subject to abuse-of-discretion review, and a properly preserved procedural challenge would be subject to *de novo* review. *Kappes*, 2015 WL 1546810 at *20.)

But as we recently observed, there is some degree of tension in our prior cases regarding the standard of review that we apply to challenges of supervised release conditions. *Kappes*, 2015 WL 1546810 at *19. Much of the tension centers on two issues, and the interplay between them: (1) whether a defendant had prior notice of an imposed supervised release condition; and (2) what objections (or exceptions) a defendant must raise to an imposed supervised release condition, or the procedures surrounding its imposition, to avoid forfeiture. *See Kappes*, 2015 WL 1546810 at *17-21; *see also*, *United States v. Johnson*, 542 Fed. Appx. 516, 518-19, (highlighting tension in cases regarding objections and exceptions under Rule 51); Fed. R. Cr. P. 51.

Because the government concedes that Sandidge's supervised release conditions require remand, we are not called upon today to weigh in on the standard of review. We simply flag this issue, as we did in *Kappes*, as one that is likely to arise in subsequent cases.

In sum, the conditions of supervised release must be imposed to fit the particular circumstances of the defend-

ant being sentenced. In addition, they must be defined adequately enough to put defendants on notice as to what behavior is proscribed, and they must involve no greater deprivation of liberty than is reasonably necessary.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's imposition of the 4-level "in connection with another felony" enhancement and its denial of the 3-level acceptance-of-responsibility reduction. We AFFIRM the district court's imposition of a consecutive sentence. And we VACATE the conditions of supervised release and REMAND that portion of Sandidge's sentence for resentencing consistent with this opinion.