In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2984

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARCEL A. WALTON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 15-cr-723 — T**homas M. Durkin**, *Judge.*

ARGUED OCTOBER 2, 2018 — DECIDED OCTOBER 25, 2018

Before BAUER, KANNE, and SCUDDER, *Circuit Judges.*

PER CURIAM. Marcel Walton, a "Grand Sheik" of the Moorish Science Temple of America in Chicago, stole more than $3 million from the Internal Revenue Service ("IRS") by filing and assisting others in filing fraudulent tax returns. He pled guilty to mail fraud, *see* 18 U.S.C. § 1341, and was sentenced to 68 months' imprisonment—below the advisory guidelines

range. On appeal, Walton asserts that the district court violated his due-process rights by relying on inaccurate information in determining the appropriate sentence. Because Walton does not show that any information was false, nor that the district court relied on any inaccuracies, we affirm.

## I. BACKGROUND

The Moorish Temple is a religious organization that believes Moors are the rightful owners of North America. As a "Grand Sheik," Walton preached that the United States government occupies Moorish land and now owes its members payment, which they could acquire by filing specialized tax returns. Many people filed fraudulent tax returns at Walton's urging. He took a percentage of the refunds some of his followers received.

Walton pled guilty to mail fraud. At the close of the change-of-plea hearing, the judge asked the government to provide information about defendants who had been prosecuted for similar schemes—specifically, the actual and intended-loss amounts and the ultimate sentences. The government's submission (included as an attachment to the Presentence Investigation Report ("PSR") and updated via email before sentencing) shows that the other defendants received sentences ranging from probation to 28 months' imprisonment. Meanwhile, the probation officer calculated a guidelines imprisonment range of 70 to 87 months for Walton. Walton had a criminal history category of I and the offense level was set at 27, based on an agreed-upon intended-loss amount of $16,391,161.

At the sentencing hearing, neither party contested the guidelines calculation, including the use of $16 million as the

intended-loss amount,[1] but they disputed the appropriate sentence. The government argued that Walton's leadership role—specifically, instructing at least nine people to prepare, or preparing for them, phony tax returns—distinguished him from the defendants listed in the chart and warranted a higher sentence within the guidelines range. The government also emphasized that in some cases the victims were "vulnerable" because there were elderly, homeless, destitute, or caring for sick relatives.

Walton asked for a 12-month sentence, based in part on his personal circumstances, including his age, his history of employment, his lack of criminal history, and his ready guilty plea. And although he admitted that "he helped others do it," he emphasized that he did not invent the scheme. He further argued that of all the defendants on the government's chart— which his counsel deemed "helpful"—"very, very, very few people have ever been sentenced within the guidelines." Moreover, Walton said, a higher sentence would result in unwarranted sentencing disparities because he learned about the scheme from a defendant in another case, who had received a 24-month sentence.

The district court imposed a 68-month sentence. The judge emphasized Walton's exploitation of vulnerable followers,

---

[1] This includes the losses directly attributable to Walton and to nine named followers interviewed by federal agents who reported acting on his instructions. At least five of them—those who successfully obtained tax refunds—were also prosecuted. The government maintained at sentencing that the scheme involved an intended loss that was much greater than $16 million and involved more than nine people, but elected to rely upon the intended losses attributable to the people who reported that Walton had recruited them.

some of whom were elderly or homeless, and many of whom believed his religious rhetoric and had not committed crimes before meeting him. The judge also confirmed that no one on the government's chart received a leader-organizer enhancement, as Walton had. The "most aggravating fact" was that Walton was responsible for "law-abiding people who got into this and ended up … going to jail" just so he could get a "piece of the action." Regarding the need to avoid unwarranted sentencing disparities, the district court explained that the "key distinguishing feature" was that the others, with two possible exceptions, "weren't leaders," whereas many people, some of whom were prosecuted, filed phony returns "because of Mr. Walton."

To the defendant's vague protest that he "didn't necessarily have access to the factual backgrounds concerning all similar cases … including the ones on [the government's] chart," the judge responded that there was no dispute that this defendant, Walton, lured at least nine people into criminal activity. Further, considering potential sentencing disparities, the district judge disregarded the chart as useless, because the intended losses for all the listed defendants were not comparable. Finally, after announcing the sentence, the judge asked Walton if he wished to address "anything else," and Walton said he did not.

## II. ANALYSIS

On appeal, Walton argues that the district court erred at sentencing by relying on untested representations about Walton's leadership role and uncorroborated sentencing data about other tax-fraud prosecutions. If a defendant has preserved his or her objection, we review procedural sentencing errors *de novo*. *United States v. Young*, 863 F.3d 685, 688 (7th

Cir. 2017). But Walton's conduct at sentencing shows a forfeiture: he relied on some of the information he now challenges and only vaguely protested that he "didn't necessarily have access to the factual backgrounds concerning all similar cases," after the judge stated that Walton's leader-status distinguished him from those prosecuted in similar schemes. And Walton failed to challenge at all the government's statements regarding the vulnerability of his co-schemers. Therefore, we review for plain error. *See United States v. Butler*, 777 F.3d 382, 386–87 (7th Cir. 2015).

The Fifth Amendment guarantees the right to be sentenced based on accurate information. *See United States v. Tucker*, 404 U.S. 443, 448–49 (1972); *United States v. Adams*, 879 F.3d 826, 829 (7th Cir. 2018). To establish a violation, a defendant must show both that the information is false and that the court relied on it. *United States v. Musgraves,* 831 F.3d 454, 469 (7th Cir. 2016). Walton can show neither, and so there is no error, let alone one that is "plain."

Walton begins by listing four "unproven, disputed, and unsupported facts": (1) he preyed on vulnerable followers; (2) he was a "leader" in contrast to "all others" who have been prosecuted for similar crimes and that he led other people into his scheme; (3) he profited from a 10% "tithe" from followers who got unwarranted tax refunds; and (4) the $16 million intended loss far exceeded the stakes in other, similar cases. Walton says that he has "since verified" that many of the facts the government stated were "false and unreliable," by examining public records in other prosecutions. The remainder of these facts he dismisses as "unsupported."

It appears that, in part, Walton argues that these statements are "unsupported" because the "record on appeal" excludes the documents before the district court that could have supported them, such as the parties' sentencing memoranda, the probation officer's sentencing recommendation, and the government's version. But there are no documents in the appellate record that should not be there. And even if the record on appeal did exclude the documents that Walton disputes, the uncontested record provided a sufficient basis for the district court to make the findings Walton challenges, so this argument lacks merit.

Walton contends first that the government mischaracterized information related to his leadership role in persuading others to join the scheme. He asserts that the district court could not rely upon the existence of the purported followers who received, or tried to obtain, fraudulent refunds at his urging, because none of them testified, and the record did not contain their written statements or other evidence. But, as Walton admits, the Rules of Evidence do not apply at sentencing hearings. As long as information "has sufficient indicia of reliability to support its probable accuracy," *United States v. Sunmola*, 887 F.3d 830, 839 (7th Cir. 2018) (quoting *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000)), it does not require full corroboration, *United States v. Sandidge*, 784 F.3d 1055, 1062 (7th Cir. 2015).

Here, uncontested documents like the plea agreement and the PSR, which the district court adopted after allowing Walton the opportunity to object, support the district judge's finding that Walton led others into the scheme. To support its argument that Walton was a leader, based upon his enlistment

of followers, the government said: "those were the individuals where we'd had law enforcement agents go out, get those statements, and/or put these individuals in grand jury." Also, the PSR proffered that "the IRS interviewed … individuals and those individuals identified the defendant as the one who prepared, or caused the preparation of their false 1041 forms."

Similarly, to support the existence of a 10% kickback to Walton, which the government called a "tithe," the government pointed to the plea agreement, in which Walton agreed that "various individuals such as temple member Christopher Mietus, who filed three tax returns by Mr. Walton, received $900,000, and then gave Mr. Walton $90,000." The PSR also states that Dawn Shannon "received a $300,000 refund check, of which she gave $35,000 … to the defendant," and that Ronald Taylor "received a $300,000 refund check" and "gave $35,000 to the defendant and another $4,400 to the … Temple, which were both deposited by the defendant."

Walton does nothing to challenge the accuracy of this information. In rebuttal, he offers only his own vague speculation that other leaders *must* have been prosecuted: he reasons that other ring leaders must be listed on the sentencing chart that the government provided simply by virtue of the sheer number of false tax returns submitted as part of similar schemes. Such naked assertions do not meet Walton's burden to show that the district court relied on inaccurate facts. *See United States v. Musa*, 946 F.2d 1297, 1307 (7th Cir. 1991).

Furthermore, Walton did not contest the leader/organizer enhancement, and the judge focused specifically on the followers whom Walton himself led into the scheme. When the judge relies on the PSR, "[t]he defendant must do more than merely deny the facts in the report; instead, he must provide

some evidence calling into question the accuracy or reliability of the information in the PSR." *United States v. Harmon*, 721 F.3d 877, 889 (7th Cir. 2013). Here, Walton does not show any inaccuracy, and he has not demonstrated that the PSR and the factual basis in the plea agreement are unreliable; he simply asks for more proof than the government is required to give. The district court properly considered the documents underlying the government's assertions, *see Adams*, 879 F.3d at 829, and they support the truth of the information provided at sentencing.

Walton next takes issue with what he deems the unsupported proposition that the $16 million intended loss attributed to him (without dispute) far exceeds what the defendants in other cases were held responsible for. Again, he did not complain about the comparison chart before or at the sentencing hearing, at which he deemed it "helpful" in light of the government's superior ability to round up the information. Moreover, Walton's post-sentencing research does nothing to support his point that the district court used inaccurate information: he lists certain defendants as to whom he thinks the intended loss amounts were understated, but even the non-inflated numbers he posits do not approach the $16 million figure to which he admitted. In any event, when it came to the intended-loss figures, the district court ultimately rejected the chart's relevance to Walton's sentencing, because the government had not identified a defendant similarly situated to Walton in that regard. The court looked at Walton individually.

Next, whether the district court relied on statements about Walton's co-schemers' vulnerability is a closer call, but even if it did, the court would not have violated Walton's due-

process rights by doing so. First, the record shows that Walton used his religious clout to persuade his followers to commit crimes: he recruited through the Temple and justified the fraud with reference to the federal government's debt to the Moors. The district court, therefore, reasonably inferred that Walton leveraged his authority and followers' beliefs. *See United States v. Anaya*, 32 F.3d 308, 313 (7th Cir. 1994).

And though the government said for the first time at sentencing that some of Walton's co-schemers were elderly or homeless, it had argued before the hearing, in its Sentencing Memorandum, that he preyed on his followers' vulnerabilities. Furthermore, the PSR named several of Walton's followers, so he could have anticipated the government's arguments. And yet again, Walton does not show that some of the followers he recruited *were not* vulnerable, so he cannot demonstrate that this information is untrue. He cannot baldly state the information is unreliable without providing a reason to call it into question.

### III. CONCLUSION

Because Walton's due-process claim is meritless, the district court's judgment is AFFIRMED.